**Frederick DICKERSON, Petitioner,**

v.

**Betty MITCHELL, Warden,
Respondent.**

**No. 1:00 CV 2356.**

United States District Court,
N.D. Ohio,
Western Division.

Sept. 21, 2004.

David L. Doughten, Cleveland, OH, Jeffrey J. Helmick, Helmick, Prajsner & Hoolahan, Toledo, OH, for Plaintiff.

Charles L. Wille, Henry G. Appel, Office of the Attorney General State of Ohio Capital Crimes Section, Columbus, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Petitioner Frederick Dickerson's Petition for a writ of habeas corpus, (Doc. No. 24). Respondent, Betty Mitchell, filed a Return of Writ, (Doc. No. 26), to which Petitioner filed a Traverse, (Doc. No. 46). Thereafter, Respondent filed a Sur–Reply, (Doc. No. 47). For the following reasons, Petitioner's motion for a writ of habeas corpus will be denied.

### I. Factual Background

On May 31, 1985, Dickerson was indicted by a Lucas County grand jury on two counts of aggravated murder pursuant to Ohio Revised Code § 2903.01(B). Each count carried with it a felony murder specification pursuant to Ohio Revised Code § 2929.04(A)(7), a mass murder specification pursuant to Ohio Revised Code § 2929.04(A)(5), and a firearm specification pursuant to Ohio Revised Code § 2929.71.

Dickerson waived his right to a trial by jury and his trial by a three-judge panel commenced on November 4, 1985. The panel found Dickerson guilty of both counts of aggravated murder and of the attached specifications. On November 7, 1985, the panel imposed the death sentence for each count of aggravated murder and two consecutive three-year terms of incarceration for the two firearm specifications. The panel entered its judgment on November 13, 1985.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Dickerson's direct appeal of his convictions and sentence:

Defendant-appellant, Frederick Dickerson, and Denise Howard were involved in a relationship between 1978 and March 1985. Out of this relationship, two children, Frederick and Jovan, were born. Howard decided to terminate her relationship with appellant because of verbal and physical abuse he had allegedly inflicted upon her. Shortly thereafter, Howard and her children moved in with Kevin McCoy, who shared a duplex apartment with Davida McClain and her children, Tony, Donya, and Nicole. Nicole was also known as Sue. The apartment was located at 1552½ Pinewood in Toledo, Ohio.

Upon discovering Howard's new address, appellant went there on May 26, 1985 in an attempt to renew his relationship with Howard. When Howard rebuffed appellant's overtures for a reconciliation, appellant assaulted her. This assault was witnessed by Curtis Jewell, a patrolman with the Toledo Police Department who was off-duty at the time. Jewell asked his father to call the police and went to assist Howard. As a result of this incident, appellant was placed under arrest and charged with disorderly conduct. Subsequently, Howard, her children and McCoy went to the residence of McCoy's mother and returned to the Pinewood apartment at approximately 2:30 a.m. on May 27, 1985. At that time, Howard found a note on her car window from appellant. Approximately an hour later, Howard saw appellant at the side of the Pinewood apartment and promptly called police. Howard testified that she called the police again at approximately 4:00 a.m. upon hearing someone at the side of the apartment, and phoned them again approximately one-half hour later when she observed appellant near the apartment. Upon investigating each time, the police were unable to locate appellant in the vicinity of the apartment.

Shortly thereafter, however, Howard testified that she heard a window in the apartment bathroom being opened, whereupon she awakened McCoy. McCoy left the bedroom, grabbed a chair and apparently charged toward the bathroom window. Howard ran out the door and down the stairs when she heard a crash and a gunshot. Upon running to a nearby house, she called the police. Before the police could respond to the call, appellant shot McCoy in the chest and in the back of the head. Appellant also shot Nicole McClain twice in the face. The record indicates that McCoy died at the scene, and that McClain died within approximately two hours of the shootings.

Appellant was arrested at approximately 6:00 a.m. next to the rear stairwell outside the Pinewood apartment. The arresting officers recovered a .22 caliber nine-shot revolver from appellant that was later identified as the murder weapon.

On May 31, 1985, appellant was indicted by the grand jury on two counts of aggravated murder. Each count carried a felony murder specification and a mass murder specification, as well as firearm specifications.

On October 18, 1985, appellant waived his right to a trial by jury. Consequently, his trial before a three-judge panel commenced on November 4, 1985. The guilt phase of the trial concluded the following day, whereupon the panel returned verdicts finding appellant guilty of both counts of aggravated murder, as well as the specifications attached to those counts.

The mitigation hearing took place immediately thereafter, and on November 7, 1985, the panel announced its judgment that the aggravating circumstances outweighed the mitigating factors beyond a

reasonable doubt. Therefore, the panel imposed the death sentence for each count of aggravated murder and two consecutive three-year terms of actual incarceration for the conviction of the two firearm specifications. On November 13, 1985, the panel entered its judgment entry of sentence.

*State v. Dickerson*, 45 Ohio St.3d 206, 543 N.E.2d 1250, 1252 (1989).

## II. Procedural History

Dickerson, represented by Fritz Byers, filed a timely direct appeal of the trial court judgment to the Sixth District Court of Appeals setting forth twelve (12) assignments of error. The Court of Appeals affirmed Dickerson's conviction and sentence. *State v. Dickerson*, No. L–85–433, 1988 WL 13216 (1988). Dickerson then appealed to the Ohio Supreme Court, raising fifteen (15) propositions of law. The Ohio Supreme Court affirmed the conviction and sentence on September 6, 1989. *State v. Dickerson*, 45 Ohio St.3d 206, 543 N.E.2d 1250 (1989). Dickerson concluded his direct appeal by petitioning the United States Supreme Court for certiorari on three issues of law. The Supreme Court denied the petition. *Dickerson v. Ohio*, 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990).

On November 21, 1990, Dickerson filed a petition for post-conviction relief pursuant to Ohio Revised Code § 2953.21 in the Lucas County Court of Common Pleas, alleging twenty-four (24) claims for relief. Concurrently, Dickerson filed a motion to recuse the trial judge, the Honorable Richard Knepper. On February 28, 1991, Dickerson filed a first amended petition, alleging twenty-six (26) claims for relief. Dickerson later filed a second amended petition, alleging the same twenty-six (26) claims for relief. Thereafter, the State of Ohio filed a motion for summary judgment.

Judge Knepper granted Dickerson's motion for recusal and transferred the case to the Honorable James Bates on June 25, 1991. One month later, Judge Bates denied Dickerson's petition for post-conviction relief. Dickerson then filed a motion for relief from judgment and a motion for Judge Bates to recuse himself. The court denied both motions.

Dickerson filed a notice of appeal of his post-conviction petition on August 26, 1991, alleging thirteen (13) assignments of error. On June 11, 1993, the Sixth District Court of Appeals found Dickerson's first assignment of error (recusal of Judge Bates) to be well-taken and denied the remaining assignments of error as moot. The Court of Appeals remanded the case to the trial court.

On June 21, 1993, the case was reassigned to the Honorable Frederick McDonald. Judge McDonald heard oral arguments on the State of Ohio's motion to dismiss the case on January 23, 1998. The trial court granted the State of Ohio's summary judgment motion one month later, dismissing Dickerson's petition for post-conviction relief.

Dickerson again appealed the trial court's decision to the Sixth District Court of Appeals. He filed a brief alleging one assignment of error. On January 14, 2000, the Court of Appeals filed its opinion affirming the trial court's denial of post-conviction relief. Dickerson appealed that decision to the Ohio Supreme Court on February 15, 2000, raising two propositions of law. The Ohio Supreme Court dismissed Dickerson's appeal as not invoking a substantial constitutional question on May 3, 2000. Although Dickerson filed a motion for reconsideration, the Ohio Supreme Court denied the motion on June 14, 2000.

## III. Habeas Proceeding

On September 15, 2000, Dickerson filed a Notice of Intent to file a habeas corpus petition pursuant to 28 U.S.C. § 2254, (Doc. No. 1). Concurrently, Dickerson filed a Motion for a Stay of Execution, a Motion for Appointment of Counsel, and a Motion to proceed *In Forma Pauperis*, (Doc. Nos. 2, 3, 4). The Court granted all motions and appointed David Doughten and Jeffrey Helmick to represent him. Dickerson filed the Petition on March 16, 2001, (Doc. No. 24). Respondent filed the Return of Writ on June 7, 2001, (Doc. No. 26). After requesting and receiving two extensions, Dickerson filed the Traverse on August 6, 2001, (Doc. No. 46), to which Respondent filed a Sur–Reply on August 21, 2001, (Doc. No. 47).

Upon its initial review of the claims presented in the Petition, the Court concluded that the factual evidence Dickerson supplied to support his fourth claims for relief was insufficient to render a fully informed decision. Accordingly, the Court issued an Order to Show Cause Why an Evidentiary Hearing Should Not Issue, (Doc. No. 53). In her Response to the Court's Order, the Respondent indicated that she did not oppose an evidentiary hearing, (Doc. No. 54). Upon deposing trial counsel, however, both parties believed it unnecessary to hold a hearing, as the depositions provided ample factual development for this Court to decide the jury waiver claims raised in the Petition, (Doc. No. 58). Thereafter, the parties submitted post-deposition briefs, (Doc. Nos. 66, 69).

## IV. Petitioner's Grounds for Relief

Dickerson asserts sixteen claims for relief in the Petition. The claims are as follows:

1. The judgment against Petitioner is void or voidable because his death sentence was secured through the use of a statutory scheme that violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 2 and 9 of the Ohio Constitution.

2. The Petitioner did not voluntarily, intelligently, and knowledgeably waive his right to a jury trial. The resultant convictions and sentences were thus in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

3. The trial court erred in accepting the Petitioner's waiver as properly executed in violation of Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

4. Dickerson was denied the effective assistance of counsel in the guilt-innocence determination phase as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

5. The judgment against Petitioner Dickerson is void or voidable because the three-judge panel that sentenced Petitioner to death did not apply the prescribed criteria for sentencing in violation of Ohio Revised Code § 2929.03 nor did it adequately specify the reasoning process it used to assess Petitioner's mitigating evidence in violation of Ohio Revised Code § 2929.03 and the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

6. The judgment against Petitioner Dickerson is void or voidable because the three-judge panel in his case at trial weighed non-statutory aggravating circumstances against mitigating factors in violation of Ohio Revised Code § 2941.14(B) and Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States

Constitution. In addition, the trial court improperly admitted irrelevant reports to impeach experts on the issue of the Petitioner's mental health at the time of the offense.

7. The judgment against Petitioner Dickerson is void or voidable because the three-judge panel that decided Petitioner's case and imposed a death sentence on him issued a capital sentencing opinion that did not meet the standards of Ohio Revised Code § 2929.03(F) thus depriving the Petitioner of a state-created interest and thus denying him his constitutional rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

8. The judgment against Petitioner Dickerson is void or voidable because the indictment in his capital case failed to state all elements required to be proven to obtain a finding of guilt as to the charges of aggravated murder and the accompanying specifications, thereby denying the Petitioner sufficient information as to the charges against him for purposes of preparing a defense in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

9. Where counsel fails to investigate and present relevant mitigating evidence which, if presented, should have resulted in a life sentence, a capitally accused defendant is denied the effective assistance of counsel.

10. The judgment against Petitioner Dickerson is void or voidable because the Petitioner was denied the effective assistance of counsel and his due process right to a fair trial, and his right not to be subject to cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth, and Four-

teenth Amendments of the United States Constitution due to the actions of the presiding judge of the three-judge panel that convicted and sentenced Petitioner Dickerson to death.

11. The state failed to introduce sufficient evidence upon which to premise a conviction for aggravated murder and, therefore, Dickerson's conviction and sentence of death deprived him of substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

12. The judgment against Petitioner Dickerson is void or voidable because of disproportionality and racial bias in the application of the death penalty in Petitioner's case in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

13. The judgment against Petitioner Dickerson is void or voidable because the guilt and mitigation phases of his trial were replete with errors, making his sentence of death unreliable and inappropriate in violation of his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

14. Dickerson's convictions and/or sentences are void and/or voidable because of the cumulative effect of the errors that occurred in his case.

15. Petitioner's conviction and sentence of death are void or voidable as the Lucas County [sic] Court of Appeals improperly corrected the trial court's violation of Ohio Revised Code § 2929.03.

16. Dickerson's convictions and sentences are void or voidable because he was convicted and sentenced to death pur-

suant to Ohio Revised Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929 .03, and 2929.04, and his death sentence was reviewed on appeal pursuant to Ohio Revised Code § 2929.05, which are all unconstitutional, both on their face and as applied. Dickerson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by his conviction and death sentence.

### V. Standard of Review

Dickerson filed his Petition on March 16, 2001, well after the effective date of the Anti–Terrorism and Effective Death Penalty Act (hereinafter "AEDPA"). Consequently, the Court will utilize this standard when analyzing Dickerson's claims. The AEDPA changed federal habeas corpus law in several important respects. Among the most significant of these changes is the standard of review to be applied to state court legal and factual determinations. Under the Act:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court, in *(Terry) Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), set forth the standard of review a federal habeas court must apply under § 2254(d).[1] The Supreme Court provided definitions for the phrases "contrary to," "unreasonable application of," and "clearly established federal law" in § 2254(d)(1). *Id.*

■ The Supreme Court first pointed out that the phrases "contrary to" and "unreasonable application of" must be given independent meanings. *Id.* at 404–05, 120 S.Ct. 1495. A state court decision can be "contrary to" the Supreme Court's clearly established precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law," and (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that decision. *Id.*

The *Williams* Court also stated that the word "contrary" "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.* Thus, § 2254 "suggests that the state court's decision must be substantially different from the relevant precedent of [the Supreme Court]." *Id.* The Supreme Court suggested that this phrase would be applicable if the state court applies a rule that contradicts the governing law set forth in prior Supreme Court cases, such as if a state court were to hold that, in order to establish an ineffective assistance of counsel claim, a defendant

---

1. This decision displaced the Sixth Circuit's prior efforts in *Nevers v. Killinger,* 169 F.3d 352, 361–62 (6th Cir.1999) and *Maurino v. Johnson,* 210 F.3d 638, 643–44 (6th Cir.2000) to clarify this aspect of the statute. *See Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir.2000). The Court finds that, to the extent both parties cited this case law in their briefs, it is inapplicable to this proceeding.

must prove by a preponderance of the evidence, instead of only a "reasonable probability," that the results of the trial would have been different. *Id.* at 405–06, 120 S.Ct. 1495.

■ The Supreme Court held that an "unreasonable application" occurs when "the state identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." [2] *Id.* at 410, 413, 120 S.Ct. 1495 ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.") (emphasis in original). *See also Bell v. Cone,* 535 U.S. 685, 698–99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)(holding that, for petitioner to succeed on a habeas claim, "he must do more than show that he would have satisfied [the applicable Supreme Court] test if his claim were being analyzed in the first instance, because under 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state court applied [Supreme Court precedent] incorrectly.... Rather, he must show that the [state court] applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner.").

The Supreme Court also pointed out that, to determine the reasonableness of the state court's decision, a court must employ an objective test, not a subjective one. The *Williams* Court, thus, rejected the Fourth Circuit's holding that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable." *Williams,* 529 U.S. at 376, 120 S.Ct. 1495. The Court reasoned that this test was too subjective because a court might "rest its determination ... on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 410, 120 S.Ct. 1495.

The *Williams* Court also provided further guidance for the phrase "clearly established holdings of the Supreme Court." *Id.* at 412, 120 S.Ct. 1495. The Court stated that this statutory phrase "refers to the holdings as opposed to its dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* The Sixth Circuit has noted that "this provision marks 'significant change' and prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law...." *Harris v. Stovall,* 212 F.3d 940, 944 (6th Cir. 2000) (quoting *Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir.1998)).

■ The *Williams* Court referred to the jurisprudence it has developed under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to help guide

---

**2.** The Supreme Court also discussed a second aspect of the Fourth Circuit's test to determine whether the state court "unreasonably applied" applicable precedent. *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. The second part of the Fourth Circuit's test provided that a state court "unreasonably applies" Supreme Court precedent "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* The Supreme Court had reservations about this prong of the test, because it was imprecise and could be difficult to apply. The Court stated that, "although that holding may perhaps be correct, that classification does have some problems of precision." *Id.* at 408, 120 S.Ct. 1495. Finding that the case in front of it did not require the Court to reach this issue, the *Williams* Court decided to leave for another day how such "extension of legal principle" cases should be treated.

federal courts as to what qualifies as "clearly established Federal law." *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. The Court stated "[w]hatever would qualify as an 'old rule' under *Teague* will constitute 'clearly established Federal law, as determined by [this] Court.'" *Id.* Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Thus, a case announces a new rule if the result was not predicated on precedent existing at the time the defendant's conviction became final. *Id.* "In determining whether the relief requested would constitute a new rule, the question becomes, 'whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Harris v. Stovall*, 212 F.3d at 944 (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994)).; *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

## VI. Exhaustion and Procedural Default

### A. Exhaustion

■■ A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). A habe-

as petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

■■ Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them. If a habeas petitioner sought to return to state court and attempt to present new claims to the Ohio Supreme Court, that court would find them procedurally barred. "The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals." *Fornash v. Marshall*, 686 F.2d 1179, 1185 n. 7 (6th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983)(citing *State v. Phillips*, 27 Ohio St.2d 294, 272 N.E.2d 347, 352 (1971)). Thus, Dickerson's failure to raise a claim to the Ohio Court of Appeals would preclude Ohio Supreme Court review. This preclusion, in turn, would prevent Dickerson from satisfying the exhaustion requirement as the Ohio Supreme Court has not had a "fair and full opportunity" to review these claims as *Rust* requires.[3]

■ A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir.2001)(quoting

---

**3.** The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

*Coleman v. Mitchell,* 244 F.3d 533, 538 (6th Cir.2001), *cert. denied,* 535 U.S. 1031, 122 S.Ct. 1639, 152 L.Ed.2d 647 (2002))(internal quotation marks omitted). Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle,* 261 F.3d 594, 608 (6th Cir.2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell,* 274 F.3d at 349. To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker,* 224 F.3d 542, 550 (6th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001)(citing *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

## B. Procedural Default

■ For purposes of comity, a federal court may not consider "contentions of federal law that are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If a

> state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."

*Coleman v. Thompson,* 501 U.S. 722, 749, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). As the United States Supreme Court recently explained, "[t]he procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

■ In *Maupin v. Smith,* 785 F.2d 135 (6th Cir.1986), the Sixth Circuit Court of Appeals set out the analytical framework for determining the defaulted status of a claim: "When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated [four-prong] analysis." *Id.* at 138. Specifically, the Sixth Circuit stated:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.... Second, the court must decide whether the state courts actually enforced the state procedural sanction.... Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. [Fourth, if] the court determines that a state procedural rule was not complied with and that rule was an adequate and independent state ground, then the petitioner must demonstrate ... that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Id.* (citations omitted).

The Respondent asserts that all or part of six claims raised in the Petition are

barred from review by this Court because they are procedurally defaulted.[4] The Court will address each individual claim of procedural default on that basis. At this juncture, however, the Court will address the Ohio doctrine of *res judicata* pursuant to *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967).

▮▮▮▮ Dickerson argues that Ohio's post-conviction relief system does not meet federal constitutional requirements because of the Ohio Supreme Court's interpretation of the post-conviction statutes in *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Under the *Perry* doctrine, a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id.* at 108; *see also State v. Roberts*, 1 Ohio St.3d 36, 437 N.E.2d 598, 601 (1982)(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on collateral, rather than constitutional, issues). Thus, unless a claim is based on evidence *dehors* the record, it must be raised during direct appeal, or be deemed waived.

▮▮▮▮ Dickerson cites no authority requiring this court to find *Perry* unconstitutional. This is not surprising considering the Sixth Circuit has expressly found that the *Perry* rule is an adequate and independent state ground to bar a merit review of a petitioner's claim where such claim is asserted in non-compliance with that rule. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir.2001)("This court has held that [the

*Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.")(citing *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000), *cert. denied*, 531 U.S. 1186, 121 S.Ct. 1176, 148 L.Ed.2d 1034 (2001)). *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir.1999), *cert. denied*, 528 U.S. 946, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999)(noting that the *Perry* rule has been consistently applied); *Brooks v. Edwards*, 96 F.3d 1448, 1996 WL 506505, at *5 (6th Cir. 1996)("The procedural rule [of *res judicata* ] applicable to petitioner's claims is an adequate and independent state ground for refusal to hear the claim by the Ohio Supreme Court."). Consequently, this Court holds that any claim that the Ohio courts refused to address based on *Perry* is procedurally defaulted and barred from habeas review absent a showing of cause and prejudice.

## VII. Individual Grounds for Relief

### A. First, Twelfth, and Sixteenth Grounds for Relief—Death Penalty Unconstitutional

#### 1. First Ground

Dickerson claims that the death penalty is unconstitutional on several grounds. Although Dickerson alleged in his first ground for relief that Ohio Revised Code is unconstitutional because it fails to establish a burden of proof in the mitigation phase for a three-judge panel, Dickerson withdrew this claim in his Traverse. Therefore, the Court will not address it.

#### 2. Twelfth Ground

Dickerson next asserts that the Ohio death penalty is unconstitutional because the manner in which it is imposed is both disproportionate and racially discriminato-

---

4. Respondent alleges that Dickerson has procedurally defaulted all or part of the fourth, eighth, ninth, thirteenth, fourteenth, and sixteenth claims for relief.

ry. Respondent concedes that this claim is properly before the Court because Dickerson raised it as his fourteenth proposition of law to the Ohio Supreme Court. Thus, the Court will address this claim on the merits.

■ A proportionality review is not constitutionally required. *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). *See also McQueen v. Scroggy,* 99 F.3d 1302, 1333–34 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997)("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review."). By statute, however, Ohio requires the appellate courts to engage in a proportionality review. Ohio Revised Code § 2929.05(A) reads in relevant part:

In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

■ Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. *Kordenbrock v. Scroggy,* 680 F.Supp. 867, 899 (E.D.Ky.1988), *aff'd,* 889 F.2d 69 (6th Cir.1989)(citing *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)).

Nonetheless, when the state courts have engaged in a proportionality review, the district court's review is limited. The district court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." *Id.* (citing *Moore v. Balkcom,* 716 F.2d 1511, 1517 (11th Cir.1983)). *See also Spinkellink v. Wainwright,* 578 F.2d 582, 604 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979)(same).

In *Spinkellink,* the petitioner argued that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences. All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

*Moore,* 716 F.2d at 1517–18 (citing *Spinkellink*). The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." *Id.* (citing *Spinkellink*).

A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Id.* Moreover, when examining an Ohio conviction on habeas review, the Sixth Circuit held that, because "proportionality review is not required by the Constitution,

states have great latitude in defining the pool of cases used for comparison." *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001). This Court cannot impose its own opinion regarding the proportionality of the instant case. Thus, because the Court finds that the imposition of the death penalty in this case does not "shock the conscience," it must find that his claim is not well-taken.

■ Dickerson next asserts that the Ohio death penalty is applied in a racially discriminatory manner and that the Court of Appeals erred when it denied his motion to remand to the trial court so that he could adduce evidence of racial bias. The Ohio Supreme Court disagreed. After correctly identifying *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), as the controlling United States Supreme Court precedent on the issue, the court noted that the *McCleskey* Court held that, to prevail on a racial discrimination claim, a defendant must demonstrate that "the decisionmakers in *his* case acted with discriminatory purpose." *State v. Dickerson*, 543 N.E.2d at 1260 (quoting *McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756)(emphasis in original). The Ohio Supreme Court found that the evidence Dickerson wished to adduce was "little more than statistics based on two Lucas County cases." *Id.* Finding that it had repeatedly rejected statistics in *McCleskey*-type assertions, the Ohio Supreme Court found the claim to be without merit.

■ The Court finds the Ohio Supreme Court's holding was not clearly contrary to or an unreasonable application of *McCleskey*. *McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756. According to *McCleskey*, a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants of a particular race. Instead, the capital defendant must prove that the decision maker in his or her individual case acted with a discrim-

inatory purpose, and that such actions had a discriminatory effect on the proceeding. *Id.* Because the Ohio Supreme Court's holding comported with *McCleskey*, the Court finds Dickerson's twelfth claim to be without merit.

### 3. Sixteenth Ground

■ Dickerson's sixteenth ground for relief is aimed at the structure of Ohio's capital punishment scheme. In this claim, Dickerson asserts that Ohio's capital punishment scheme is unconstitutional on its face. Respondent alleges this claim is procedurally defaulted but does not state with specificity why each sub-claim was not properly raised in state court. Regardless of the defaulted status of Dickerson's sub-claims, the Court is not persuaded by Dickerson's allegations. In summary fashion, the Court will list below Dickerson's allegations, in italics, and thereafter state the reasons they are unpersuasive.

● *Ohio's scheme is not the least restrictive means of effectuating deterrence.* The United States Supreme Court addressed this exact point in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible." *Id.* at 175, 96 S.Ct. 2909.

● *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.* Once again, the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), rejected this argument under a similar death penalty statute, condoning the discretionary system.

● *Ohio's scheme permits the jury to find for a death sentence without first finding that the defendant acted with premedita-*

*tion and deliberation.* This argument is groundless as Ohio Revised Code § 2903.01(E) requires no person to be convicted of aggravated murder unless he or she is "specifically found to have intended to cause the death of another. . . ." Moreover, the United States Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, *i.e.,* reckless indifference, as an acceptable level of culpability to impose the death penalty. *See Tison v. Arizona,* 481 U.S. 137, 156, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)(affirming death sentence of capital defendant who took part in prison escape but was not present when murder of kidnapped family occurred because he possessed a "reckless disregard for human life.").

• *Ohio's scheme is unconstitutional because it fails to establish a standard for determining the existence of mitigating factors.* While the United States Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida,* 430 U.S. 349, 361, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), there is no actual criterion stating that the trial judge or jury must identify and articulate the specific factors used to formulate the decision. Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness." *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795, 807 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986). Thus, no constitutional infirmity exists.

• *Ohio's scheme is unconstitutional because it fails to set a standard of proof for the jury for balancing mitigating factors with aggravating circumstances.* The United States Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase. *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

• *Ohio's scheme is unconstitutional because it permits the trier of fact to consider aggravating circumstances at the guilt phase or one of the aggravating factors merely repeats an element of the crime.* The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty. In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court held that any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant. Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence. *Id.* at 605, 98 S.Ct. 2954. The Supreme Court further refined the statutory limiting requirement in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Id.* at 877, 103 S.Ct. 2733. Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1987).

Ohio's death penalty scheme complies with these mandates. First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors. Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute. Finally, the Ohio death penalty scheme satisfies the *Zant* requirements by demanding the fact finder to find the existence of at least one aggravating circumstance set forth in § 2929.04(A) prior to imposing a death sentence.

- *Ohio's scheme is unconstitutional because it fails to provide the sentencing authority with an option to impose a life sentence when it finds that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt or when it finds only aggravating circumstances exist.* The Supreme Court rejected the identical argument in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.* In *United States v. Jackson*, 390 U.S. 570, 582, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnaping statute because it authorized only the jury to impose the death sentence. Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial." *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795, 808 (1986). Consequently, the Ohio scheme comports with constitutional mandates.

- *Ohio's scheme creates a mandatory death penalty.* The Court presumes that this argument is essentially the identical argument presented above (that the jury must impose a death sentence when it finds the aggravating circumstances outweigh the mitigating factors). The Court need not readdress that argument here. Without further explanation as to the nature of this claim, the Court cannot address it further.

- *Ohio's scheme permits the State to argue first and last in the mitigation phase of trial.* Even if this sequence does place a capital defendant at a disadvantage, and the Court does not so find, this fact does not implicate a constitutional violation. As long as a state requires the prosecution to prove the existence of all aggravating circumstances, the defendant's constitutional rights are not violated. *Walton v. Arizona*, 497 U.S. 639, 649–51, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).[5]

---

5. This aspect of the *Walton* holding is unaltered by the recent Supreme Court decision *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In that case, the Court overruled *Walton* because it found *Walton* irreconcilable with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), a case in which the Court held that the Sixth Amendment does not permit a judge to impose a sentence that would exceed the maximum sentence to which the defendant would be exposed if punished pursuant to the facts found by a jury. Thus, because *Walton* found Arizona's capital sentencing constitutional even though it permitted a judge alone to find aggravating factors and impose a death sentence, the *Ring* Court overruled it. The Court limited its holding, however, overruling *Walton* only "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609, 122 S.Ct. 2428. Consequently, the portion of *Walton*

• *Ohio's death penalty is applied in an arbitrary and capricious manner.* Other than bald assertion, Dickerson cites no specifics about the Ohio statutory scheme that substantiates his argument. More importantly, Dickerson does not state why the Ohio courts' application of the death penalty statutes runs afoul of United States Supreme Court jurisprudence.

• *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.* Although the Fifth Amendment would be violated if a court *ordered* a defendant to undergo a psychiatric examination without informing the defendant that his statements can be used against him and then admitted his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, *see Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself. This reasoning is explained in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987):

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the exami-

nation that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* at 422–23, 107 S.Ct. 2906 (citations omitted).

• *Ohio's scheme is unconstitutional because it imposes the death penalty in a racially discriminatory manner.* As stated above, according to *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a capital defendant cannot evade a death sentence merely by demonstrating the statistical disparity of capital defendants of a particular race. Instead, a capital defendant must prove that the decision-maker in his or her individual case acted with a discriminatory purpose, and that such actions had a discriminatory effect on the proceeding. *Id.* at 292, 107 S.Ct. 1756. Dickerson has made no such showing in his case.

• *Ohio's scheme is unconstitutional because it fails to require that the State prove the existence of any mitigating factors.* This argument was specifically rejected in *Walton v. Arizona,* 497 U.S. 639, 649–50, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). There the Court held a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting. This aspect of the *Walton* holding is unaltered by the recent Supreme Court decision *Ring v. Arizona,* as described, *supra.*

• *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.* The Supreme Court rejected an argument similar to this one in *Blystone v. Pennsylvania,*

finding it permissible for the prosecution to present both the initial opening argument and

last closing argument remains intact.

494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In that case, the defendant challenged the constitutionality of the Pennsylvania death penalty statutes, which, similar to Ohio's, requires that the jury recommend the death penalty if the aggravating circumstances outweigh the mitigating factors. In upholding this statutory scheme, the *Blystone* Court determined that the statutes were constitutional because they permitted the sentencer "to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* at 304–05, 110 S.Ct. 1078 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989))(internal quotation marks omitted). Ohio's death penalty statutes permit the sentencing body to consider all mitigating evidence pursuant to the "catch-all" mitigating factor, Ohio Rev.Code § 2929.04(B)(7).[6] Moreover, the Ohio scheme provides for an appropriateness review on direct appeal.

- *Ohio's scheme is unconstitutional because the defendant must prove the absence of mitigating factors by a preponderance of evidence.* As stated above, the Supreme Court accepted this penalty scheme in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), did not overrule this holding.

- *Ohio's scheme in unconstitutional because it inadequately tracks cases reviewed when determining the proportionality of the sentence.* The Court addressed this argument in Dickerson's twelfth ground for relief and will not re-address it here.

- *Ohio's scheme is unconstitutional because a jury or three-judge panel is not required to identify and articulate the existence of mitigating factors and aggravating circumstances.* No such constitutional mandate exists. Moreover, as stated above, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness." *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795, 807 (1986), *cert. denied*, 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986).

### B. Second, Third, and Tenth Grounds for Relief—Jury Waiver

Dickerson asserts that his jury waiver was constitutionally infirm on several grounds. First, he claims that his initial jury waiver was not knowing, voluntary, and intelligent. Dickerson also contends that he was not notified of his right to withdraw the waiver once he learned that a panel member had sentenced him in a different proceeding. He further claims that the jury waiver is invalid because he was not informed that if he waived a jury trial, he faced an increased risk of being

---

**6.** That statute states:

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, ..., the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

\* \* \* \* \* \*

(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

*Ohio Rev.Code* § 2929.04(B)(7).

sentenced to death. Finally, Dickerson alleges that Judge Knepper, a member of his three-judge panel, induced trial counsel to waive the jury trial because of an *ex parte* conversation Judge Knepper had with defense counsel prior to trial. The Court addresses the merits of each claim as well as whether each claim is procedurally defaulted individually.

### 1. Knowing, Voluntary, and Intelligent Waiver

Dickerson first asserts that his initial waiver was not knowing, voluntary, and intelligent and, thus, was constitutionally defective. He raised this claim to the Ohio Supreme Court, which addressed it on the merits. Therefore, the Court finds that it is not procedurally defaulted.

 The right to a jury trial is a fundamental constitutional right. *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). To effectively waive this right, a criminal defendant must meet the following four conditions: (1) the waiver must be in writing; (2) the government attorney must consent to the waiver; (3) the trial court must consent to the waiver; and, (4) the defendant's waiver must be knowing, voluntary and intelligent. *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir.2002)(citing *United States v. Martin*, 704 F.2d 267, 272 (6th Cir.1983)). For a waiver to be knowing, voluntary, and intelligent, the defendant must possess the mental capacity to comprehend what he is waiving, as well as be sufficiently informed about the consequences of his decision. Specifically, a defendant should know that the jury is composed of 12 members, that he may participate in jury selection, that the jury must be unanimous in reaching a verdict, and, if the defendant elects to waive this right, the judge alone will decide the defendant's guilt or innocence. *Id.*

 Although it is preferable for the trial court to conduct an on-the-record colloquy of the waiver, there is no constitutional right to such a colloquy. *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir.2004)(following *Martin*, 704 F.2d at 273). Moreover, failure to conduct an on-the-record colloquy "does not *ipso facto* constitute reversible error." *United States v. Cochran*, 770 F.2d 850, 853 (9th Cir.1985). Once a waiver is effectuated, the burden is on the petitioner to demonstrate that the waiver of the jury trial right was *prima facie* invalid. *Sowell*, 372 F.3d at 832; *Milone v. Camp*, 22 F.3d 693, 704 (7th Cir.1994). Whether the jury trial waiver was invalid depends on the factual circumstances of the case. *Lott v. Coyle*, 261 F.3d 594, 615 (6th Cir.2001)(quoting *Martin*, 704 F.2d at 272.). On habeas review, a state court's determination that a petitioner's jury trial waiver was valid is a finding of fact entitled to a presumption of correctness pursuant to § 2254(e)(1) unless the petitioner can overcome this presumption by clear and convincing evidence. *Spytma v. Howes*, 313 F.3d at 371. "In the absence of contemporaneous evidence outside of the written waiver showing that the waiver was [not] knowing and intelligent, [a court] must give presumptive force to [the] written document." *Id.*

 In the instant case, Dickerson provided the trial court with a written waiver that both he and defense counsel signed. Tr. Appendix, Vol. I, at 31. Moreover, the trial court conducted the following colloquy prior to accepting Dickerson's waiver:

> The Court: We are here for purposes of formally waiving a jury trial in this matter, is that correct, Mr. Cameron?
>
> Mr. Cameron: That's correct, Your Honor.
>
> The Court: All right.
>
> Mr. Cameron: We've explained to Mr. Dickerson what he would be waiving by waiving the jury, and I think he

understands that we would be going to a three-judge panel, and he is in agreement with that.

The Court: Now, Mr. Dickerson, you do understand that in this type of case there are in fact two separate trials. One is as to the charges and the specifications. That includes the gun specification, as well as the death specifications; do you understand that?

The Defendant: (Nodded affirmatively)

The Court: You understand that you have a right to have those presented to a jury and that those charges and specifications have to proven beyond a reasonable doubt; you understand that?

The Defendant: (Nodded affirmatively)

The Court: To a jury. You have to answer verbally for the Court Reporter.

The Defendant: Yes.

The Court: You understand that. Also you understand that in the event that there were findings of guilty by a jury as to the charges, the gun specification and the death specifications, there would be a second trial which would go—or hearing which would go to the questions of mitigation. It's called a mitigation hearing, and a jury would then decide also whether or not the death penalty should be imposed or whether some lesser penalty, that being life with possibility of parole in 30 years, or life with possibility of parole in 20 years should be imposed; do you understand that?

The Defendant: Yes.

The Court: And you understand by giving up this right to a trial by jury that you're not only giving up the right to have the guilt phase handled by a jury, but you're giving up the right to have the mitigation hearing or the penalty stage heard by a jury; do you understand that?

The Defendant: (Nodded affirmatively)

The Court: And that that penalty stage will be tried by a three-judge panel as well, and if in fact you get to that stage of the trial, that three-judge panel will determine whether or not the penalty should be [life imprisonment] or the death penalty should be imposed; do you understand that?

The Defendant: Yes.

The Court: Okay. And you're willing to give up your right to a trial by jury and have a three-judge panel determine all of those issues, is that correct?

The Defendant: Yes.

* * *

The Court: Now, Mr. Dickerson, before we conclude this, I want to ask you did you understand my explanation of what you're giving up here?

The Defendant: Yes.

The Court: Do you have any questions that you want to ask me about that or about anything that's being done or is going to be occurring in the next several weeks?

The Defendant: No, Your Honor.

The Court: You don't need additional explanation of the waiver that you're making?

The Defendant: No.

The Court: Of what you're giving up?

The Defendant: No.

The Court: Okay. And you understand everything that I said to you?

The Defendant: Yes.

* * * * * *

The Court: All right, and you reviewed this waiver form and you understand it ... ? I just want to make sure you understand what's happening here.

The Defendant: Yes.

The Court: All right, you do understand it?

The Defendant; Yes.

The Court: And this is your signature here on the waiver of the jury trial?

The Defendant: Yes.

The Court: All right. And I would note for the record that counsel, Mr. Cameron, has also signed where indicated for the defendant. I find that the defendant understands his right to a jury trial in this case, that he is knowingly and voluntarily giving up that right and consenting to this case, the guilt phase and mitigation phase being tried to a three-judge panel.

Tr. Trans., Vol. II, at 4–10.

The Court finds that while it certainly would have been preferable for the trial court to inform Dickerson further about the composition and function of a jury, it cannot find that the Ohio Supreme Court's findings on this issue were unreasonable. *Lott v. Coyle*, 261 F.3d 594, 615 (6th Cir. 2001), is instructive here. In that case, the Sixth Circuit found that, based on the trial court's on-the-record colloquy, the sufficiency of the jury waiver issue was a close question. It noted that the trial court in that case had not discerned the extent of the petitioner's conversation with counsel regarding the ramifications of waiving a jury trial. *Id.* Although the *Lott* court, as this Court, noted that there were several statements absent from the colloquy, the Sixth Circuit found that no error occurred.

Moreover, although not binding authority, the Court finds that case law discussing the analogous Federal Rule of Criminal Procedure 23(a) provides it with guidance. Those cases have held that a written waiver "creates a presumption that the waiver is a voluntary, knowing, and intelligent one." *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990), *cert. denied*,

510 U.S. 1204, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994)(quoting *United States v. Cochran*, 770 F.2d 850, 851 (9th Cir.1985)). Finally, although Dickerson asserts that his mental limitations [7] required the trial court to conduct a more rigorous colloquy to discern whether Dickerson comprehended the consequences of his waiver, the Court cannot agree. The written waiver along the with the on-the-record colloquy were sufficient to notify him about the rights he was foregoing. While a more extensive colloquy would be preferable, the Court cannot find that Dickerson has rebutted the state court's finding that his jury waiver was knowing, voluntary, and intelligent with "clear and convincing evidence, as is required in order to obtain habeas relief." *Spytma*, 313 F.3d at 371 (citing *Rickman v. Bell*, 131 F.3d 1150, 1153–54 (6th Cir.1997)). Thus, he cannot succeed on this claim.

**2. Right to Withdraw Waiver**

Having found that Dickerson's jury waiver was constitutionally sufficient, however, does not end the inquiry. Dickerson also claims that the trial court committed constitutional error when it failed to inform him that he could withdraw the waiver after Dickerson learned that one member of the three-judge panel had sentenced him in another criminal proceeding. Dickerson raised this issue to the Ohio Supreme Court on direct appeal and on postconviction relief. Although the Ohio Supreme Court addressed the merits, the Sixth District Court of Appeals found the claim barred by *res judicata*. For the reasons discussed below, however, the Court finds that this claim is not procedurally defaulted and will address it on the merits.

 On the morning trial was to begin, Dickerson noted to defense counsel that

---

7. *See* discussion of Dickerson's I.Q., *infra*.

one of the three-judge panel members had sentenced him in another matter. Defense counsel raised the issue to the panel, which addressed it as follows:

The Court: All right. Also it has come to the Court's attention just prior to trial that Judge Glasser had been previously involved with the defendant in some prior prosecutions of Mr. Dickerson, or a prior prosecution of Mr. Dickerson, is that correct? And would you for the record recite your knowledge of that?

Mr. Konop: Mr. Dickerson indicated to me that it was his understanding that Judge Glasser had been the judge in a case in which Mr.—I believe it was [a] retaining stolen property case.

Defendant: Receiving.

Mr. Konop: Receiving stolen property case where Mr. Dickerson was the defendant, and he was sentenced by Judge Glasser for that particular case. That was his recollection, and [I] indicated to him that I would make that inquiry, and I have so made the inquiry.

Judge Glasser: That may be true. I don't specifically recall Mr. Dickerson.

Mr. Konop: Right.

The Court: All right. I would like to note for the record and have you note, Mr. Konop, prior to this date, I believe probably sometime after October 18th, perhaps within two days after October the 18th, I advised you at that time of who the three-judge panel would be made up of, is that correct?

Mr. Konop: That's correct, Your Honor.

The Court: And at that time I advised you that it would be myself, Judge Doneghy and Judge Glasser, is that correct?

Mr. Konop: That's correct, Your Honor.

The Court: So there has been sufficient time—

Mr. Konop: Yes.

The Court: (Continuing)—for Mr. Dickerson to be aware of the names of the judges on the three-judge panel?

Mr. Konop: That's correct. I think that what happened was he just wasn't sure, and it just sort of jogged his memory. That was the reason.

The Court: And this question came up and the prior history was disclosed only this morning, is that correct?

Mr. Konop: That's correct.

The Court: All right. All right, I believe that there is nothing further. Are there any other objections to any of the other members of the panel? And I don't think there is an objection being made here to Judge Glasser, is there?

Mr. Konop: No, there's not.

The Court: So there are no objections to any one of the members of this three-judge panel, is that correct?

Mr. Konop: (Indicated negatively).

Tr. Trans., Vol. II, at 13–15. Dickerson now argues that, once the trial court was apprized of Judge Glasser's prior dealings with him, the trial court had a constitutional obligation to advise Dickerson of his right to withdraw the jury waiver. To support this claim, Dickerson supplied the post-conviction relief court with two affidavits. In the first, trial counsel Alan S. Konop avers that, while he told Dickerson that he likely could receive a new judge on the panel if he requested one, he at no time informed Dickerson that he had a right under Ohio law to withdraw his jury waiver before trial began. Appendix, Vol. V, at 162. Not surprisingly, the second affidavit is from Dickerson indicating that, if he had been informed about the right to withdraw, he would have exercised it. *Id.* at 164.

██ The Sixth District Court of Appeals found the claim to be barred by *res*

*judicata* because it found that "the affidavits attached to [the] petition for post conviction relief fail to provide any evidence outside the record." *State v. Dickerson*, No. L–98–1100, 2000 WL 28320, at *3 (2000). This Court, however, disagrees. Both affidavits supply information regarding attorney-client conversations (or lack thereof) that would not be part of the trial court record. Moreover, Respondent has not alleged that these claims are procedurally defaulted. This Court need not address the defaulted status of a claim where the State has failed to do so. *See, e.g., Jamison v. Collins*, 100 F.Supp.2d 521, 597 (S.D.Ohio 1998)(addressing merits of claim when respondent failed to raise procedural default defense in return of writ or supplemental return of writ). Out of an abundance of caution, however, the Court undertakes this analysis and finds that because the affidavits supplied by Konop and Dickerson constitute evidence outside of or *de hors* the record, this claim is not procedurally defaulted.

This claim presents the Court with a difficult issue. As stated above, the Ohio Supreme Court addressed this claim on direct appeal and found that the record did not support the claim. It stated:

Upon careful review of the record, we find that there is no indication, either express or implied, that appellant desired to withdraw his jury trial waiver. On the morning that appellant's trial began, defense counsel informed the presiding judge of his concern regarding one of the other judges on the panel. The record indicates the court's first order of business that day was to confirm that appellant had withdrawn his earlier plea of not guilty by reason of insanity. The court then confirmed that appellant still desired to waive his right to a trial by jury. The court next discussed the appellant's concern over the impartiality of the judge in question, who responded that he did not "specifi-

cally recall" appellant. The presiding judge then invited objection by appellant to the judge in question or to any other member of the three-judge panel. Appellant, through counsel, responded that he had no objection to any of the judges on the panel. In our view, there in nothing in the record that would suggest in any manner that appellant desired to withdraw his waiver to a jury trial.

*State v. Dickerson*, 45 Ohio St.3d 206, 543 N.E.2d 1250, 1254 (1989). In ruling alternatively on the merits, the Sixth District Court of Appeals found that the issue had no merit, holding:

The appellant asserts in his affidavit that at no time did the court or his attorneys inform him that he could take back his waiver and have his case tried in front of a jury rather than a three-judge panel. The record in this case provides evidence to the contrary. On October 18, 1995, a hearing was held solely for the purpose of the appellant formally waiving his right to a jury trial. The court informed the appellant of his right to have his case presented to a jury. The court further explained that by giving up the right to trial by jury, he was not only giving up the right to have the guilt phase handled by the jury, but he was also giving up the right to have the penalty phase heard by a jury. The court repeatedly, throughout the hearing, inquired as to whether the appellant understood what he was giving up and he consistently answered in the affirmative.

On November 4, 1985, just prior to the trial's commencement, the trial court again inquired as to whether it was still the appellant's desire to waive his right to have his case tried by a jury. The appellant again personally indicated that this was still his desire. This second inquiry occurred after the appellant had

seen the judges that would make up the three-judge panel and after he had expressed his concern about Judge Glasser's inclusion on the panel.

*State v. Dickerson,* 2000 WL 28320, at *3–4.

Both decisions offer little reasoning to which the Court may defer. First, the Ohio Supreme Court's decision correctly notes that the record failed to provide it with any evidence of Dickerson's desire to withdraw his jury waiver. This finding, however, fails to address the issue Dickerson raised. Rather than asserting that the trial court did not comply with his wishes to withdraw the waiver, Dickerson claims that the trial court or counsel should have informed him of his *right to withdraw* the waiver after learning that Judge Glasser was a member of the panel. This the trial court clearly did not do. Thus, the inquiry that the Ohio Supreme Court should have undertaken (and that this Court must now undertake), is whether the trial court had a duty to inform Dickerson of his right to withdraw the waiver once he discovered that Judge Glasser was a panel member.

While it is clear from the record that the trial court did not inform Dickerson that he could withdraw the waiver, only evidence *de hors* the record could support a finding that counsel also failed to inform Dickerson of his right to withdraw. According to counsel's affidavit, he did not so advise Dickerson. Although the Court of Appeals noted that trial counsel supplied the affidavit advising of this omission, that court also failed to adjudicate on the trial court or counsel's duty to inform a criminal defendant of his or her right to withdraw a jury trial waiver. In fact, the Sixth District Court of Appeals failed to address the content of the affidavits altogether. Finally, the Court of Appeals found that the trial court asked Dickerson whether it was still his desire to waive the jury trial after it addressed his concern about Judge Glas-

ser. This factual finding is incorrect. It is clear from the record that the trial court confirmed Dickerson's decision to waive the jury trial prior to addressing Judge Glasser's prior dealings with him. *See* Tr. Trans., Vol. II, at 12–13.

Because the Ohio Supreme Court and Sixth District Court of Appeals neither addressed the issue Dickerson raised nor the affidavits he supplied to support it, this Court must now do so. The Court must ascertain whether a criminal defendant possesses a constitutional right to be informed that a jury trial waiver may be withdrawn prior to trial. If such a right exists, then this Court likely would have to find that constitutional error occurred and the writ must be granted because "jury waiver issue[s are] arguably not subject to a harmless error analysis." *Spytma v. Howes,* 313 F.3d 363, 372 (6th Cir.2002); *see also United States v. Duarte–Higareda,* 113 F.3d 1000, 1003 (9th Cir.1997)(holding that jury waiver that was not knowing, voluntary, and intelligent was "structural" error not subject to a harmless error analysis).

While there is little authority on this subject, it does appear that the right to withdraw a jury waiver is not absolute. In a factually similar case involving a 28 U.S.C. § 2255 petition, the Fourth Circuit determined that a trial court has no duty to inform a criminal defendant about the right to withdraw the jury waiver once it is effectuated. *Wyatt v. United States,* 591 F.2d 260, 262 (4th Cir.1979). In that case, the defendant learned that the judge who was to preside over his trial also had presided over his alleged co-conspirator's trial. During the co-conspirator's case, the defendant testified that Wyatt had been involved with narcotics trafficking. *Id.* On habeas review, Wyatt argued that the trial judge was required to conduct a second colloquy to discern whether Wyatt still

wished to waive his right to a jury trial in light of the fact that the trial judge had heard testimony about him in his co-conspirator's case.

■ The Fourth Circuit held that, pursuant to Federal Rule of Criminal Procedure 23(a) [8], there was no requirement to conduct a second colloquy:

> To accept Wyatt's theory then would require a very special reading of the effect of all Rule 23(a) jury waivers given, as they frequently are, in advance of the trial date. In effect, it would require that they be reconfirmed by interrogation undertaken *sua sponte* by the judge presiding at trial to ensure that the waiver earlier given and not sought to be withdrawn remained voluntarily and intelligently given in the face of any personal predilections or special knowledge of the trial judge that might conceivably have influenced the waiver decision had these been known to the defendant at waiver time. We cannot so read the Rule nor the underlying constitutional concerns it is designed to safeguard.

*Id.* at 264. Thus, the Fourth Circuit found no constitutional duty to inform a petitioner of the right to withdraw the jury waiver even when intervening facts about the trial judge's personal knowledge of the defendant arise after waiver has occurred. The First Circuit has held similarly. *See United States v. Kelley*, 712 F.2d 884, 886 (1st Cir.1983)(holding that trial judge was under no constitutional obligation to inform defendant of the right to withdraw his jury waiver even though the trial judge had authorized a wiretap order allowing the government to electronically intercept conversations of defendant's trial counsel).

While these cases certainly appear to address the issue Dickerson raised, they present the Court with only non-binding authority. Additionally, as Dickerson argues in the Petition, he has a full-scale I.Q. of 77. *Petition*, at 15. Thus, he claims, the Court should consider this factor in determining whether he was able to comprehend fully that he could withdraw his jury trial waiver after seeing Judge Glasser on the panel without being so told.

Ultimately, however, Dickerson's low I.Q. score does not merit granting the writ. As stated in the limited case law addressing these unusual factual circumstances, both the First and Fourth Circuits have held that a criminal defendant does not have a constitutional right to be notified of the right to withdraw the jury waiver. In the absence of any authority in the Sixth Circuit on which the Court can glean such a constitutional right, the Court believes

---

8. Federal Rule of Criminal Procedure 23(a) and (c) states:

(a) **Trial by Jury.** Cases required to be tried by a jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.

\* \* \* \* \* \*

(c) **Trial Without a Jury.** In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general finding, find the facts specifically. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

Ohio's Rule of Criminal Procedure 23(c) is somewhat analogous to the federal rule. It states:

(A) **Trial by jury**

In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney....

\* \* \* \* \* \*

(C) **Trial without a jury**

In a case tried without a jury the court shall make a general finding.

Ohio R.Crim. P. 23.

802

the reasoning of those Circuits noted above justify not granting a writ.

### 3. Increased Risk of Death Penalty

█ Dickerson also asserts that the jury waiver was not knowing, voluntary, and intelligent because he was not informed that if he were tried before a three-judge panel, he faced an increased chance of being sentenced to death. Dickerson raised this as his second proposition of law to the Ohio Supreme Court. That court addressed it on the merits. Consequently, this Court may do likewise.

In its opinion the Ohio Supreme Court stated that, pursuant to Ohio law, a three-judge panel is held to the identical beyond a reasonable doubt standard of proof as a jury. *State v. Dickerson*, 45 Ohio St.3d 206, 543 N.E.2d 1250, 1254 (1989). Consequently, the court held there was no effect on Dickerson's sentencing because he chose to waive his right to a jury trial. *Id.* Dickerson cannot demonstrate that this claim involves a federal constitutional question, much less that the Ohio Supreme Court's interpretation of Ohio law was clearly contrary to any United States Supreme Court precedent. Consequently, the Court finds this claim to be without merit.

### 4. Judge Knepper's actions violated effective assistance and due process rights

Finally, Dickerson claims that the presiding judge, Judge Knepper, caused ineffective assistance of counsel and denied him the right to due process of law because of an *ex parte* conversation between Judge Knepper and defense counsel prior to trial. Defense counsel Alan Konop averred that he met with Judge Knepper, the presiding judge on the three-judge

panel prior to trial, *ex parte*, to discuss some legal and factual issues in the case.[9] Specifically, Konop spoke about Dickerson's mental state at the time he committed the murders and the results of a psychological examination performed by Dr. Thomas Sherman, the director of the Lucas County Court Diagnostic & Treatment Center, with whom, Konop knew, Judge Knepper was familiar through multiple appearances before him. Appendix, Vol. V, at 159–60. In response to the information Konop conveyed, Judge Knepper suggested that Konop consider waiving Dickerson's right to a jury trial. *Id.* at 160. Konop "took this suggestion to be an indication from Judge Knepper that trial by a three judge panel would be in Mr. Dickerson's best interest." *Id.* Konop thereafter persuaded Dickerson to waive his right to a jury trial. Although the Sixth District Court of Appeals found this claim to be procedurally defaulted because that court found that the affidavits did not constitute evidence *de hors* the record, this Court, as discussed *supra*, disagrees. Additionally, Respondent raised no procedural default defense to this claim for relief. Accordingly, the Court will address the claim on the merits.

█ The Court will not address here Dickerson's ineffective assistance of counsel claim based on Konop's actions as that issue will be addressed in Dickerson's fourth claim for relief below. The Court decides here the issues of whether Judge Knepper caused counsel's ineffectiveness or denied Dickerson due process by "suggesting" that Dickerson waive his right to a jury trial. In an alternative holding, the Court of Appeals during post-conviction

**9.** While it is ethically questionable for both the trial court and trial counsel to meet *ex parte* to discuss issues in an upcoming trial, that issue, while possibly a judicial and professional responsibility code violation, is not a constitutional one. Thus, because the Court may only grant habeas relief for constitutional violations, 28 U.S.C. § 2254, the Court need not address the propriety of the meeting in its Opinion.

proceedings found this claim to be without merit. It stated:

> Based on [the Konop–Knepper] communication and the advice of counsel, the appellant waived his right to a jury trial. The fact that this communication took place, shows the rational thought process used by the appellant in reaching his decision to waive his right to a jury trial. It provides evidence that the appellant's waiver was in fact knowingly and intelligently made. The appellant's waiver was made on the advice of counsel. Now in hindsight, due to the fact that the result was not favorable to the appellant, the appellant claims that his waiver was not made knowingly. Failing to achieve an expected outcome does not render a waiver invalid.

*State v. Dickerson,* No. L–98–1100, 2000 WL 28320, at *4 (2000).

The Court finds this conclusion was not an unreasonable one. Moreover, Dickerson cannot support with authority that it is the trial court's responsibility to discern what counsel may have gleaned from the *ex parte* conversation. It was not inappropriate for Judge Knepper to suggest that Konop persuade Dickerson to waive a jury trial because, as Konop stated in his affidavit, Judge Knepper was familiar with the proposed testifying psychologist and, perhaps, believed that his testimony would be better received by himself and his brethren than by a jury. Ultimately, the Court finds that Judge Knepper cannot be held responsible for the counsel's advice to Dickerson or Dickerson's decision to accept it. Accordingly the Court finds this claim to be not well-taken.

### 5. Fourth and Ninth Grounds for Relief—Ineffective Assistance of Counsel

Dickerson alleges ineffective assistance of counsel at both the guilt and penalty phases of trial. The grounds and defaulted status of each claim will be addressed on an individual basis below. Here, the Court sets forth the applicable law and standard of review it will apply to each claim.

To assert a successful ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the petitioner must show that he was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

To demonstrate ineffective assistance of counsel, a petitioner must point to specific errors in counsel's performance. *United States v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689, 104 S.Ct. 2052. " 'Judicial scrutiny of a counsel's performance must be highly deferential and ... 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' " *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)(quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). To ascertain whether counsel's per-

formance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### 6. Ineffective Assistance During the Guilt Phase

Dickerson claims counsel's unreasonable acts prejudiced the outcome of the guilt phase in several respects. First, Dickerson claims that counsel committed several errors related to his jury waiver. Specifically, he alleges that counsel failed to inform him of the increased risk he was undergoing by waiving his right to a jury trial. Further, he alleges that counsel was unreasonable for relying on the *ex parte* conversation with Judge Knepper as a basis for advising Dickerson to waive his right to a jury trial. In essence, Dickerson asserts that counsel was unreasonable for believing that if Dickerson waived the right to a jury trial, then he would not receive the death penalty. Dickerson also alleges that counsel should have objected when the three-judge panel failed to inform him that he had a right to withdraw his jury waiver after Dickerson realized that one of the panel members previously had sentenced him in another criminal matter.

In addition to the claims relating to the jury waiver, Dickerson alleges counsel was ineffective for failing to properly cross-examine Denise Howard and Donya McClain.

### i. Jury Waiver Claims

Dickerson first alleges trial counsel's ineffectiveness for failing to notify him that if he waived his right to a jury trial, then he faced an increased risk of being sentenced to death. As stated above, Dicker-

son cannot demonstrate that the Ohio Supreme Court was unreasonable when it held that, pursuant to Ohio law, a three-judge panel is held to the same standard— beyond a reasonable doubt—as is a jury. Thus, Dickerson cannot demonstrate that he was prejudiced in this respect by counsel's advice to waive a jury trial. Accordingly this claim is not well-taken.

■ Dickerson next claims that counsel was ineffective for relying on the *ex parte* conversation with Judge Knepper in assuming that, if persuaded to waive his right to a jury trial, Dickerson would not receive the death penalty. On appeal to the Sixth District Court of Appeals during post-conviction relief proceedings, the Sixth District found this claim to be barred by *res judicata.* After first noting that the issue was raised on direct appeal, the court held that "[t]he affidavits provided by the appellant fail to provide evidence outside the record. Therefore, the trial court correctly held that this assignment was barred by *res judicata.* *Perry, supra."* *State v. Dickerson,* 2000 WL 28320, at *5. As stated above, however, this Court finds that the affidavits of Dickerson and defense counsel Konop do constitute evidence outside the record. Moreover, Respondent did not raise procedural default as a defense in the Return of Writ. *Return,* at 39. Thus, the Court finds this claim is not procedurally defaulted and will address it on the merits.

During trial counsel's depositions, attorney Konop stated what he believed Judge Knepper was implying during their *ex parte* conversation. Konop stated that, initially, he and Judge Knepper spoke about Dickerson's mental condition, (Doc. No. 67, at 11). He recalled the course of the conversation was as follows:

A: I made Judge Knepper familiar with primarily the medical problems, mental issues, and as I said, I

thought that he was quite sensitive and understanding of it, and he had indicated to me that, suggested that I consider waiving a jury and proceeding to try the case before a three-judge panel.

That meant a lot to me as a trial lawyer. I felt that in saying that he understood the mental condition of Mr. Dickerson and that he would, he would be a good judge and juror in this case and that my chances of saving Mr. Dickerson from the death penalty would be greatly enhanced by waiving the jury and having this three-judge panel.

Q: Did you believe that Judge Knepper was promising not to sentence Dickerson to death in exchange for a three-judge panel?

A: No. No judge can go on the record and say, listen, waive the jury and I won't acquit—I won't sentence your client to death, but it's been my experience when the judge tells you, especially in a case like this, look, why don't you waive the jury, it'd be a good idea to waive the jury, to me it's a pretty damn good sign that he's going to not reach a verdict that would indicate the death penalty.

Q: Did you believe that it was in your certainty then that Mr. Dickerson would be given a life sentence based off your conversation with that judge?

A: Pretty close to that. I mean, you know, uncertainties are, you know, not much in life is certain, but I thought it was. I thought there was a very, very good chance beyond just a slight chance, I thought it was a damn good chance that—I thought when he said waive the jury that that was pretty solid, that he

was going to not vote for the death penalty.

*Id.* at 8–10.

It is clear to the Court that Konop believed that Judge Knepper was intimating to him that if his client waived his right to a jury trial, he would be spared the death penalty. While this finding may appear significant in subjecting Konop's conduct to a *Strickland* analysis, the recent Sixth Circuit case *Sowell v. Bradshaw,* 372 F.3d 821 (6th Cir.2004), renders it somewhat irrelevant. In that case, which is strikingly similar to the instant one, based on a pretrial conversation with the presiding judge, trial counsel believed that "if a jury was waived, this would not be a capital case." *Id.* at 828 n. 3. Counsel thereafter strongly suggested to the defendant that he waive his right to a jury trial. *Id.* The defendant accepted counsel's advise and waived this right, but received a death sentence anyway.

On habeas review, the district court granted the writ, holding that trial counsel was ineffective because counsel caused the petitioner to believe that by waiving the right to a jury trial, he would not receive a death sentence. *Id.* at 835. Moreover, it held, because the petitioner possessed low level cognitive skills and limited intelligence, he was not able to intelligently consent to the waiver. *Id.* at 835–36.

On appeal, the Sixth Circuit reversed, finding that unless trial counsel conveyed, and the petitioner believed, that the three-judge panel *could not* impose the death penalty if the petitioner waived his right to a jury trial, then counsel was not ineffective for so advising the petitioner. It stated:

[T]he simple fact that Pinales [defense counsel] mistakenly thought that Judge Crush would not impose death does not mean that Pinales was acting unreasonably.

Furthermore, there is strong evidence that everything came down to Pinales's recommendation, and it did not matter how much Sowell may or may not have been informed of what he was giving up and risking. Both Pinales and Sowell testified that Sowell trusted Pinales implicitly, and decided to waive solely because of Pinales's recommendation. *See* J.A. at 527–28 (Pinales testifying that "Billy Joe totally relied on the advice that I was giving. . . . He was like a lost puppy in the jail, and I think I became his only friend. So I certainly think he relied on what I said."); *id.* at 558–59. * * * Everything appears to come down to whether Pinales had a reasonable basis for thinking that Judge Crush would not impose a death sentence. The district court did not consider this issue, and the record does not show that Pinales had no reasonable basis for so thinking.

Pinales recommended that Sowell take a calculated risk, which he did. There was no evidence that Pinales guaranteed Sowell a result, or misstated the law.

*Id.* at 837–38.

The *Sowell* holding is fatal to Dickerson's claim. Konop, like trial counsel in *Sowell*, believed that he had a strong chance of sparing Dickerson's life if he persuaded him to forego a jury trial. This decision, as the *Sowell* court held, was reasonable as long as he did not mislead Dickerson into believing a mistake of law—that the three-judge panel could not impose the death penalty if he waived his right to a jury trial. Unfortunately for the parties and this Court, the *Sowell* decision was not issued until after the parties had deposed trial counsel. Thus, Konop did not have the opportunity to explain his beliefs (which turned out to be mistaken) during his deposition.

 It does not appear, however, that Konop misapprehended the law or that he imparted this misapprehension to his client. As stated above, while counsel believed that he had a "damn good chance" of obtaining a life sentence with Judge Knepper on a panel, he did not mistakenly believe that under the law, the possibility was excluded. Moreover, when asked what he advised to Dickerson, Konop stated that he told his client, "this is an ugly case and to me this is your best chance." (Doc. No. 67, at 21). Thus, based on Konop's deposition testimony, there is no basis to conclude that Dickerson was misled into believing that his jury waiver insulated him from a death verdict.

Finally, Dickerson makes much of his limited cognitive functioning and ability to comprehend what he was relinquishing by waiving his right to a jury trial. *Sowell* teaches, however, that these facts are not necessarily significant. As long as Dickerson knew that the possibility of a death sentence existed despite his jury waiver, he cannot assert that his counsel was constitutionally deficient for advising him to abandon that right. Because the Court finds that trial counsel did not induce Dickerson into so believing, the ineffective assistance inquiry ends. *See Sowell,* 372 F.3d at 838 ("The court is not required to address both components of *Strickland* if one component fails") (citation omitted). The Court finds this sub-claim is not well-taken.

#### ii. Cross-examination Claims

 Dickerson next claims that trial counsel were ineffective for failing to cross-examine two state witnesses. First, Dickerson asserts trial counsel should have cross-examined Denise Howard after she testified on direct examination that she saw Dickerson's hand lift up the bathroom shade. Apparently, Howard omitted this observation in her statement to police. Dickerson claims that Howard's testimony established the "force" necessary under

Ohio law for a conviction on aggravated burglary. Thus, he contends, trial counsel should have questioned Howard about this omission on cross-examination. Dickerson also alleges counsel's ineffectiveness for failing to cross-examine Donya McClain, the eight-year-old sister of one of the victims.

The Court finds these sub-claims to be procedurally defaulted. Although Dickerson raised them to the Ohio Court of Appeals on direct appeal, he did not raise them to the Ohio Supreme Court. Thus, these claims are unexhausted because, as stated above, the highest court in the state has not had an opportunity to rule on the claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990). A habeas court need not wait for exhaustion, however, if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir.2001). The Court finds that a return to state court would be futile because the time for raising these issues on direct appeal to the Ohio Supreme Court has long been expired. Thus, the Court will not address these sub-claims on the merits.[10]

### 1. Ineffective Assistance During the Mitigation Phase

Dickerson alleges that counsel were ineffective during the mitigation phase of trial in several respects. First, Dickerson claims that counsel should have moved to suppress Detective Robert Poiry's statements. Second, Dickerson alleges ineffectiveness because counsel failed to distinguish between insanity and diminished capacity in their opening statement. Dickerson claims that counsel were ineffective for failing to obtain mitigation evidence and present it during trial. Had counsel done so, Dickerson insists, counsel would have procured significant mitigating evidence. Dickerson also claims that counsel were ineffective for failing to request a mitigation expert to prepare for the mitigation phase. Dickerson next argues that defense counsel failed to argue for mercy based on the mitigating evidence. Finally, Dickerson claims that counsel should have provided mitigation evidence about his cultural background.

As stated above, to assert a successful ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the petitioner must show that he or she was prejudiced by counsel's errors.

---

**10.** Were the Court to do so it would find that neither sub-claim is well-taken. First, Dickerson's implicit allegation, that Howard's testimony regarding the lifting of the shade was necessary to convict him of aggravated burglary is without merit. Pursuant to Ohio law a conviction for aggravated burglary can be supported by a finding of entry by means of "force, stealth, or deception." Ohio Rev. Code § 2911.11. Clearly Dickerson's entry by means of a bathroom window would meet this requirement under either the force or stealth requirements of the statute. Thus, counsel was not ineffective for failing to pursue this fruitless point on cross-examination.

Second, trial counsel were not unreasonable in failing to cross-examine Donya McClain. As is clear from the trial transcripts, Donya became distressed during her trial testimony in which she described the murder of her sister. She completed testifying only because the court permitted her mother to stand next to her and hold her hand. Tr. Trans., Vol. II, at 236–37. Thus, it was reasonable for counsel not to cross-examine this distraught witness. Moreover, Dickerson fails to specify what counsel's cross-examination would have revealed. Thus, this claim lacks merit.

"This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

 Dickerson first alleges that counsel were ineffective for failing to move to suppress the statements of Detective Poiry during mitigation. Detective Poiry testified during mitigation about statements Dickerson made in the police squad car immediately after the murders occurred. Respondent asserts that this claim is procedurally defaulted because, although Dickerson raised it to the Sixth District Court of Appeals on direct appeal, he failed to raise it to the Ohio Supreme Court. Dickerson does not allege cause and prejudice to excuse this default, thus, the Court will not address the merits of the claim.

 This claim would not be well-taken even in the absence of procedural default. First, even if counsel had moved to suppress the statements, that motion likely would have been denied because, as Detective Poiry indicated during his testimony, Dickerson "quite firmly" asserted that he had been advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), yet wished to make a statement nonetheless. Tr. Trans., Vol. II, at 421. Moreover, prior to testifying regarding the statements Dickerson made in the squad car, defense counsel objected to Detective Poiry's testimony because they were not in rebuttal to any statements Dickerson had made. Thus, counsel argued, because these statements were not presented in the prosecution's case-in-chief, they should be inadmissible. *Id.* at 418–19. Counsel may not have believed it necessary to file a motion to suppress Poiry's statements. This belief, as well as counsel's objection to Poiry's testimony on cross-examination, was reasonable. Dickerson fails to satisfy the first

prong of the *Strickland* test. Consequently, this claim lacks merit.

 Dickerson next alleges ineffective assistance during the mitigation phase of trial because counsel failed to specify the difference between an insanity defense and diminished capacity in the opening argument. Although the Respondent does not assert this sub-claim is procedurally defaulted, a review of the record reveals that, while Dickerson raised this claim to the Sixth District Court of Appeals on direct appeal, he did not raise it to the Ohio Supreme Court. Thus, it appears that this claim is procedurally defaulted. In the absence of Respondent so asserting, however, the Court will address the claim on the merits.

 While Dickerson is correct in asserting that counsel did not explain the difference between insanity and diminished capacity during the opening argument in mitigation, counsel did so advise the panel in the closing argument, stating:

> The Ohio Jury Instructions on insanity say as to insanity, his reason was so impaired that he did not have the capacity to conform his conduct to the requirements of the law. That's insanity.

> Neither doctor found that test to apply in this case.... What they did say independently, unknown to one another, is this, and this is (B)(3) under 2929.04 where dealing with mitigating circumstances, and that is whether at the time of committing the offense the offender, because of a mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law.

Tr. Trans., Vol. II, at 442–43. Dickerson fails to articulate why counsel's decision to address this issue at the closing of mitigation rather than the opening was objective-

ly unreasonable. Thus, this sub-claim is not well-taken.

■ Dickerson claims that counsel were ineffective for failing to obtain mitigation evidence and present it during trial. Had counsel done so, Dickerson claims, counsel could have collected a host of mitigating evidence regarding his family background, including:

1. A father who denied his biological relationship with him;

2. The fact that Dickerson's siblings may all have different fathers;

3. Dickerson experienced early problems with bed wetting and stuttering;

4. Dickerson's mother referred to him as "the moron";

5. Dickerson had an ideation attachment to his mother that resulted in his failure to develop a meaningful relationship with another woman;

6. Dickerson was continually teased at school and became quiet and withdrawn;

7. Dickerson was raised in an atmosphere of pimps, prostitutes, and drug dealers. The younger children generally had to fight their way home from school. Several homosexual advances were made upon Dickerson.

8. Dickerson's relationships with women were unsuccessful. He fathered children with several women;

9. Dickerson's relationship with Denise Howard centered around prostitution and drugs. He believed that he had contracted a venereal disease from her.

10. Dickerson had a full-scale I.Q. of 77, placing him in the lower seven percent of cognitive ability;

11. Psychological testing would have explained his primitive thinking, how it developed and the effect the combination of the above had on his ability to make appropriate choices. It would have revealed that he had a borderline personality disorder. This disorder and its nexus to the offense would have been available to the panel.

*Petition,* at 15. Respondent does not allege that this claim is procedurally defaulted. Thus, the Court will address the claim on the merits.

When examining a claim of ineffective assistance for failure to investigate a petitioner's background and introduce mitigating evidence, "it is best to begin with the evidence Petitioner actually presented in mitigation." *Lorraine v. Coyle,* 291 F.3d 416, 427 (6th Cir.2002), *cert. denied,* 538 U.S. 947, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003). During the mitigation phase of trial, defense counsel adduced extensive testimony regarding Dickerson's mental state prior to and during the murders. First, Dr. Marvin Gottlieb testified that Dickerson, who was extremely close with his mother, became highly distraught after her death in 1984. He also testified about the unstable relationship Dickerson experienced with Denise Howard, his common-law wife of seven years and the mother of his two sons. He stated that the murders were precipitated by Howard's decision to leave Dickerson. He diagnosed Dickerson as suffering from depression and personality problems with some antisocial and some paranoid traits. Tr. Trans., Vol. II, at 273. When asked whether Dickerson would have committed the murders without the precipitating events of his mother's death and Howard's departure, Gottlieb responded that "the immediate provocation [of Howard's departure] and the gradual buildup of the whole year ... affected his ability to control his behavior." *Id.* at 275.

Dr. Sherman testified similarly, adding that because of Dickerson's mental issues, he could not tolerate separation. Thus, when Howard left him, Dr. Sherman testified, his activity became frenzied and Dickerson fluctuated between rage and despair. Further, he testified that Dickerson could

not control his actions, stating: "we have in this case an individual who suffered from a borderline personality, who was decompensated; that is, what structure and function he had left to his personality, left him, and therefore he committed the crime." *Id.* at 363. Finally, counsel adduced evidence from friends and family members that Dickerson was distressed, cried often, and neglected to care for himself after the death of his mother. Additionally, these witnesses testified that Dickerson and Howard argued often, prompting Howard's departure for several days at a time, leaving Dickerson to care for his two young sons.

In the past several years, the Sixth Circuit has issued a number of opinions on the issue of ineffective assistance of counsel during mitigation. In one of the first such cases, *Glenn v. Tate*, 71 F.3d 1204 (6th Cir.1995), the court found trial counsel were ineffective for failing to investigate and present mitigating evidence of petitioner's brain damage. Counsel in *Glenn* utterly failed to prepare for the mitigation phase of trial prior to completion of the guilt phase. Once the jury convicted petitioner, counsel prepared a videotape, later ruled inadmissible by the trial court, of petitioner's neighborhood. *Id.* at 1207. Although counsel did present testimony from, among others, a teacher who had known the petitioner during his childhood and a minister who did not know petitioner but who, rather unsuccessfully, argued against the morality of the death penalty, counsel failed to introduce an array of evidence that would have demonstrated the petitioner's mental inabilities, including I.Q. tests that placed him within the mentally defective range. *Id.* at 1208. The court concluded that, "[t]he failure of John Glenn's counsel to draw the jury's attention to the organic brain problem here, and to the possibility that it helped turn John Glenn into putty in the hands of his admired older brother [who planned the underlying crime], was both objectively unreasonable and prejudicial." *Id.* at 1211.

In the wake of *Glenn,* the Sixth Circuit held on several other occasions that counsel's failure to investigate and present mitigating evidence warranted granting habeas corpus relief. For example, in *Carter v. Bell,* 218 F.3d 581 (6th Cir.2000), the court held that counsel's representation was constitutionally ineffective because of counsel's use of a residual doubt theory during mitigation when counsel neither investigated nor presented evidence of the petitioner's extreme poverty-ridden childhood and mental condition despite counsel's awareness of those circumstances.

Finding that counsel cannot rely on the petitioner as the sole source of information when investigating for mitigating evidence, the Sixth Circuit held that "counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [its] utility." *Id.* at 596. Several other cases have followed this reasoning. *See Coleman v. Mitchell,* 268 F.3d 417, 449–53 (6th Cir.2001)(finding counsel acted unreasonably for failing to present evidence of petitioner's horrific childhood, which included physical and psychological abuse); *Skaggs v. Parker,* 235 F.3d 261, 266–75 (6th Cir.2000)(holding counsel ineffective for failing to investigate and present mitigating evidence); *Groseclose v. Bell,* 130 F.3d 1161, 1169–71 (6th Cir.1997)(finding counsel's failure to develop "any defense theory whatsoever" and failure to present mitigating evidence was constitutionally ineffective); *Austin v. Bell,* 126 F.3d 843, 849 (6th Cir. 1997)(same).

Finally, recently in *Frazier v. Huffman,* 343 F.3d 780 (6th Cir.2003), *cert denied,* — U.S. ——, 124 S.Ct. 2815, 159 L.Ed.2d 261 (2004), the Sixth Circuit held counsel acted in violation of *Strickland.* In that case, the petitioner sustained a

brain injury that impaired his brain functioning. *Id.* at 794. Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on the petitioner's behavior and commission of the crime. Moreover, counsel failed to present any mitigating evidence, other than the petitioner's unsworn statement, during the mitigation phase of trial. The Sixth Circuit held that counsel's failure to investigate could not be part of a reasonable trial strategy. *Id.* at 795. Thus, it concluded, the state court had unreasonably applied *Strickland* in its contrary finding.

The Sixth Circuit also has issued several opinions finding no ineffective assistance during mitigation. In an apparent attempt to synthesize these disparate holdings, one Sixth Circuit opinion noted that "the cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct [a mitigation] investigation." *Campbell v. Coyle,* 260 F.3d 531, 552 (6th Cir.2001). The *Campbell* court distinguished cases in which counsel failed to investigate altogether from those which do "not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation," noting that in the latter, the *Strickland* presumption of counsel's reasonableness will be hard to overcome. *Id.See also Lorraine v. Coyle,* 291 F.3d 416 (6th Cir. 2002) (reversing district court and holding no ineffective assistance of counsel for failing to present mitigation evidence, particularly in light of habeas counsel's inability to demonstrate prejudice); *Martin v. Mitchell,* 280 F.3d 594 (6th Cir.2002)(finding counsel not constitutionally ineffective for failing to present mitigating evidence when counsel did present some, albeit non-exhaustive, evidence in mitigation and petitioner failed to demonstrate prejudice); *Williams v. Coyle,* 260 F.3d 684 (6th Cir.2001)(same).

Dickerson also asserts that United States Supreme Court precedent created by *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), should guide the Court's decision on this issue because of its similarity to the instant case. Consequently, a recitation of the findings of fact and law in that case is instructive here. After sending a letter to police implicating himself as the perpetrator of an unsolved murder, the *Williams* petitioner was convicted of robbery and capital murder. *Id.* at 368–69, 120 S.Ct. 1495. During sentencing proceedings, the prosecution introduced evidence of the petitioner's extensive criminal background and of his confession to committing the murder. Petitioner's counsel presented the testimony of his mother, two neighbors, and a taped statement by a psychiatrist. One of the neighbors testified only upon being spotted by counsel in the courtroom. The psychiatrist's testimony "did little more than relate Williams's statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone." *Id.* at 369, 120 S.Ct. 1495.

During closing argument, counsel argued that the jury should give some mitigating weight to the fact that the petitioner had turned himself in to police. Counsel devoted the bulk of the closing argument, however, to stating that it was "difficult to find a reason why the jury should spare Williams's life." *Id.* Thereafter, the jury found that the petitioner possessed a probability of future dangerousness and sentenced him to death.

During state habeas proceedings, the trial court found after two days of hearings that the petitioner's trial counsel had been ineffective during sentencing. *Id.* at 370, 120 S.Ct. 1495. The trial court held that

substantial mitigating evidence was not presented during the sentencing phase, most notably the petitioner's commitment when he was eleven years old that described extensive parental mistreatment and abuse during the petitioner's childhood, as well as the petitioner's mental deficiencies. Additionally, trial counsel testified that he did not seek the petitioner's juvenile and social services records during trial because he thought that state law did not permit it. *Id.* at 373, 120 S.Ct. 1495. The trial court thereafter recommended that the petitioner be granted a rehearing on the sentencing phase of his trial. *Id.* at 371, 120 S.Ct. 1495. The Virginia Supreme Court rejected the trial court's recommendation, finding instead that the petitioner did not demonstrate prejudice sufficient to sustain an ineffective assistance of counsel claim.

On appeal from the Fourth Circuit, the United States Supreme Court found that the Virginia Supreme Court unreasonably applied the *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) two-prong ineffective assistance of counsel test. Initially, the Court found that counsel acted unreasonably during sentencing. It noted that trial counsel did not begin to prepare for the sentencing phase until a week before trial. *Williams*, 529 U.S. at 395, 120 S.Ct. 1495. More important, the Court emphasized the evidence that was not, but could have been, presented during trial. This evidence consisted of the petitioner's borderline mental functioning, his exemplary prison behavior, and his home life during childhood.[11] While the Court noted that not all evidence was favorable to the petitioner, such as his juvenile crime record, the Court found that counsel's failure to introduce the "comparatively voluminous" amount of evidence in favor of mitigation was objectively unreasonable. *Id.* at 396, 120 S.Ct. 1495. The Court also found counsel's failure to present this mitigating evidence prejudiced the outcome of the sentencing hearing. *Id.*

This exhaustive review of applicable case law reveals that the Sixth District Court of Appeals did not unreasonably apply United States Supreme Court precedent in its post-conviction appeal opinion denying this claim. It stated:

> The record in this case and the affidavits provided by the appellant clearly indicate that the appellant's trial counsel made strategic decisions concerning the presentation of witnesses and testimony during the mitigation phase of trial. Thus, the trial court correctly held that the appellant's trial counsel did prepare and present mitigation evidence and that the type of mitigation evidence presented at the mitigation phase of the trial was the result of tactical decisions made by the appellant's trial counsel. Strategy and tactical decisions exercised by defense counsel well within the range of professional reasonable judgment need not be analyzed by a reviewing court. *Strickland, supra.*

---

11. In fact, the Court noted that the following juvenile records revealed a "nightmarish" depiction of the petitioner's childhood home: The home was a complete wreck.... There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedroom. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash.... The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them.... The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey. *Id.* at 395 n. 19, 120 S.Ct. 1495.

*State v. Dickerson,* No. L–98–1100, 2000 WL 28320, at *5 (Jan. 14, 2000). Although in summary form, the Sixth District's opinion is not an unreasonable application of *Strickland* and its progeny. Moreover, it appears that, similar to the petitioner in *Campbell, supra,* Dickerson is merely "dissatisf[ied] with the degree of his attorney's investigation," rather than alleging that defense counsel failed to formulate a mitigation hearing strategy altogether. *Campbell v. Coyle,* 260 F.3d 531, 552 (6th Cir.2001).

Finally, contrary to Dickerson's assertions, this case is distinguishable from *Williams.* Although Dickerson provides the Court with background information regarding his dysfunctional family, he falls decidedly short of demonstrating that his case is similar to *Williams.* Unlike in *Williams,* trial counsel presented both expert and lay testimony regarding Dickerson's mental condition and the causal effect of his mother's death and Howard's departure in his commission of the murders. Additionally, defense counsel here prepared extensively for the mitigation phase prior to the commencement of trial, procuring the testimony of two psychologists and family members who attested to Dickerson's diminished mental and emotional well-being. Consequently, Dickerson cannot demonstrate, as he must, that the Sixth District Court of Appeals' decision was an unreasonable application of *Strickland.* Accordingly this sub-claim is not well-taken.

■ In a similar sub-claim, Dickerson argues that trial counsel was ineffective for failing to request the assistance of a mitigation specialist to investigate his childhood and familial background. On appeal from post-conviction relief, the Sixth District Court of Appeals found this claim to be procedurally barred. The court found that because Dickerson could have, but failed to, raise this claim on direct appeal, this claim was defaulted pursuant to the doctrine of *res judicata. State v. Dickerson,* 2000 WL 28320, at *5. Dickerson does not assert cause or prejudice to excuse the default. Thus, the Court will not address this claim on the merits.[12]

■ Dickerson next claims that counsel was ineffective for failing to argue for mercy during the mitigation phase of trial. Respondent asserts that this sub-claim is procedurally defaulted because Dickerson has never raised it in any Ohio Court. Dickerson does not dispute this assertion in the Traverse. Thus, the Court finds this claim to be procedurally defaulted and will not address it on the merits.

■ Were the claim not defaulted, it would be found to be without merit in any event. Dickerson's trial counsel presented a clear trial strategy during mitigation— that Dickerson's diminished capacity coupled with recent life events facilitated the commission of the crime. Dickerson's current assertion that counsel should have employed a different mitigation strategy is precisely the type of hindsight second-guessing that *Strickland* prohibits.

Finally, Dickerson alleges that counsel were ineffective for failing to present evidence of his cultural background during mitigation. Dickerson raised this issue to the Sixth District Court of Appeals during post-conviction relief proceedings. That court found the claim to be barred by the doctrine of *res judicata* because it held that Dickerson could have raised this claim on direct appeal. Dickerson has not alleged that any exception to the procedural

12. Were the Court to address the merits of this claim, it would find, for reasons stated in Dickerson's previous sub-claim alleging counsel's failure to obtain and introduce mitigating evidence, this claim lacks merit.

default bar applies. Thus, the Court finds this sub-claim to be procedurally defaulted.

Were it not defaulted, this sub-claim would be found to be without merit. As stated above, Dickerson's counsel utilized a reasonable strategy during the mitigation hearing and presented substantial evidence in support thereof. As with his previous sub-claim, this sub-claim represents the second-guessing of trial strategy that *Strickland* proscribes. Thus, this sub-claim, and Dickerson's ninth ground for relief generally, lacks merit.

## 2. Fifth, Sixth, Seventh, and Fifteenth Grounds for Relief—Trial Court's Sentencing Opinion

Dickerson asserts in the above grounds for relief that the trial court's sentencing was defective and violated his constitutional rights. Specifically, Dickerson argues that the three-judge panel neither acted in accordance with Ohio Revised Code § 2929.03 nor specified its reasoning process as required under that statute. Dickerson also contends that the panel confused the meaning of Ohio Revised Code § 2929.04(B)(3), the so-called diminished capacity mitigating factor, with Ohio's test for legal insanity. Dickerson also attacks the trial court opinion by alleging that it utilized non-statutory aggravating factors in formulating its sentencing opinion. Dickerson further alleges that the panel failed to give weight to uncontradicted mitigating evidence. Finally, Dickerson asserts that the Sixth District Court of Appeals acted improperly when it independently re-weighed the aggravating circumstances and mitigating factors as they were presented during trial.

### i. Panel's Failure to Articulate Weighing Process

Dickerson first alleges that the trial court failed to articulate its weighing process when issuing its sentencing opinion as required by Ohio Revised Code § 2929.03(F).[13] Dickerson raised this issue to the Ohio Supreme Court on direct appeal. That court addressed it on the merits. Consequently, this Court may conduct a similar review.

A review of the sentencing opinion reveals that the trial court indeed failed to articulate the weighing process it performed before reaching its sentencing decision. After a review of the mitigating factors on which Dickerson presented testimony, the court found that no mitigating factors were established by a preponderance of evidence. Further, the court held that

> [e]ven if a mitigating factor had been established by the defendant, it is the unanimous judgment of the panel that the aggravating circumstances far outweigh, beyond a reasonable doubt, the mitigating factors testified to, and further that the aggravating circumstances found in this case mandate the defendant receive the . . . death penalty.

Appendix, Vol. I, at 92.

The Ohio Supreme Court noted this defect on direct appeal. It held, however, that the trial court's failure to articulate its reasoning process did not constitute prejudicial error. Moreover, it held that inde-

---

**13.** That statute states in relevant part:

(F) The court of the panel of three judges, when it imposes a sentence of death, shall state in a separate opinion *its specific findings* as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

Ohio Rev.Code § 2929.03(F).

pendent re-weighing would cure any defect that occurred. *State v. Dickerson,* 45 Ohio St.3d 206, 543 N.E.2d 1250, 1257–58 (1989).

■ Dickerson cannot assert that the Ohio Supreme Court's opinion was contrary to or an unreasonable application of United States Supreme Court precedent. There is no precedent that stands for the proposition that the constitution requires a capital sentencer to articulate its weighing process when imposing sentence. Consequently, Dickerson's claim appears to be one asserting a state-law violation. Federal habeas courts may not correct errors of pure state law. *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Thus, this claim is not well-taken.

### ii. Panel Confused Definition of Insanity with Diminished Capacity

Dickerson next alleges that the panel erred when it articulated the test for legal insanity in finding that he did not establish the diminished capacity mitigating factor pursuant to Ohio Revised Code § 2929.03(B)(3). Dickerson raised this claim to the Ohio Supreme Court on direct appeal. Therefore, it is not procedurally defaulted.

The Ohio Supreme Court found this claim to be without merit. It initially explained that, pursuant to Ohio law, while insanity requires a defendant's absolute inability to refrain from committing the crime with which he is charged, diminished capacity merely requires that the defendant lacks substantial capacity to refrain from committing the crime. *Dickerson,* 543 N.E.2d at 1255. The court then found that even if the trial court did apply the incorrect standard in determining the mitigating factors, such error was harmless beyond a reasonable doubt. It stated:

First, the trial court found that even if diminished capacity had been established, the aggravating circumstances

would outweigh it beyond a reasonable doubt. Second, the independent review by the court of appeals effectively cured the apparent error of the sentencing court. As this court [previously] held, … the independent weighing process at each appellate level provides a procedural safeguard against the arbitrary imposition of the death penalty.

*Id.* at 1256. As with the previous subclaim, Dickerson can point to no United States Supreme Court precedent at odds with the Ohio Supreme Court's findings. Consequently, the Court finds this claim to be without merit.

### iii. Use of Non-statutory Aggravating Circumstances

■ Dickerson asserts that the trial court considered multiple non-statutory aggravating circumstances when reaching its sentencing decision. First, Dickerson claims that the trial court admitted irrelevant reports to impeach the experts who testified regarding his mental health. Dickerson also claims that the trial court considered Dickerson's statements before and after the offense, the method of killing, the youth of one of the victims, and the number of shots fired as aggravating circumstances even though these facts are not enumerated in Ohio Revised Code § 2929.04(A).

As stated above, the trial court did not articulate its weighing process in its sentencing opinion. It initially noted in the opinion, however, that it had found the existence of "each and every one of the specifications charging aggravating circumstances," Appendix, Vol. I, at 88, *i.e.,* that the offense was committed while Dickerson was committing or attempting to commit burglary and that the murder occurred during the course of murdering two people. In examining whether Dickerson

established the diminished capacity mitigating factor, the trial court further noted:

> In weighing the psychiatric testimony the Court used the standards required by law, weighing their testimony by the same standards of credibility as other witnesses. Evaluating their opinions and the observations of lay witnesses against the uncontroverted evidence regarding the actions of the defendant before, during and after he murdered the two victims, the Court finds that the defendant failed to establish by a preponderance of the evidence mental disease or defect that would cause the defendant to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
>
> It was clear from the evidence that defendant shot the decedent Kevin McCoy by placing the barrel of the gun against the back of the head of Mr. McCoy after the defendant had already shot him in the chest. The defendant then went to 15–year–old Nicole McClain and demanded to know the whereabouts of his girl friend, and when she did not respond to his satisfaction, he counted to three and then fired not one, but two fatal shots into her face at a range of less than 18 inches. It was clear that he deliberately selected, sought out, and, in an execution style, shot and killed both of his victims.

*Id.* at 91. It is the above language to which Dickerson refers when arguing that the trial court considered non-statutory aggravating factors. Dickerson raised this claim on direct appeal to the Ohio Supreme Court. Thus, the claim is not defaulted and the Court may address it on the merits.

Although no United States Supreme Court case is directly on point, *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), offers some guidance. In that case, the jury found that the state established two statutory aggravating circumstances and sentenced the petitioner to death. *Id.* at 742, 110 S.Ct. 1441. The Mississippi Supreme Court later invalidated one of the aggravating circumstances as unconstitutionally vague but upheld the death sentence because the appellate court re-weighed the sentencing decision without the invalidated aggravating factor and found it appropriate. *Id.* at 743, 110 S.Ct. 1441. The United States Supreme Court held that a death sentence could be upheld on appeal even when the jury had considered an invalid or improperly defined aggravating factor. The court determined:

> Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one or two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that one or more valid remaining aggravating factors outweigh the mitigating evidence. Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court.

*Id.* at 745, 110 S.Ct. 1441 (citations omitted). Moreover, the United States Supreme Court has held that "mere errors of state law" when reviewing death sentences are permissible "unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution." *Barclay v. Florida,* 463 U.S. 939, 957–58, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

When reviewing this claim on direct appeal, the Ohio Supreme Court initially found that the trial court did not consider

a non-statutory aggravating factor. It stated:

> In the instant case, the details surrounding the two aggravated murders were relevant to the aggravating circumstance that the offense was part of a course of conduct involving the *purposeful* killing of, or attempt to kill, two or more persons by the offender. Because the trial court is required to consider the evidence, it logically follows that the court should be permitted to discuss its consideration of the evidence in its opinion. Therefore, we find appellant's sixth proposition of law to be unmeritorious.

*Dickerson*, 543 N.E.2d at 1257(emphasis in original). Thus, the Ohio Supreme Court concluded that, as a matter of state law, the trial court did not err when it considered the above-cited facts in its sentencing opinion because those facts merely served to establish the existence of the statutory aggravating factors.

Furthermore, the Ohio Supreme Court independently re-weighed the aggravating circumstances and mitigating factors when conducting its appropriateness review, correcting any error that the trial court may have committed. *Id.* at 217–218, 543 N.E.2d 1250. Thus, any error that the trial court committed was corrected upon re-weighing. The United States Supreme Court requires nothing further.

■ Finally, Dickerson alleges in the Traverse that he has a due process liberty interest in having the sentencing court make a proper sentencing determination. He cites to *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), in support of this contention. Respondent asserts that this claim is procedurally defaulted because Dickerson failed to raise it at any juncture of his state-court appeals. Dickerson does not allege he should be excused from defaulting this claim. Thus, the Court finds this sub-claim to be defaulted and need not address it on the merits.

■ Were it to do so, however, this Court would find this sub-claim to be not well-taken. While the *Hicks* Court did state that a criminal defendant has a due process right to be sentenced by a jury, the *Hicks* holding was explicitly held inapposite to capital cases in *Clemons.* In *Clemons,* the Court held that the Mississippi state court in that case had authority under state law to independently re-weigh and affirm a death sentence. 110 S.Ct. at 1447. Because state law had created no expectation that the jury alone could make sentencing findings, no Due Process Clause liberty interest was created. Similarly, in Ohio, the Ohio Court of Appeals and Ohio Supreme Court independently re-weigh and reach a sentencing decision when reviewing capital cases committed prior to July 1, 1995. Ohio Rev.Code § 2929.05(A). Thus, Dickerson possessed no liberty interest or expectation that the trial court would be the only forum capable of making sentencing findings.

### iv. Trial Court Failed to Give Weight to Mitigating Evidence

■ Dickerson next claims that the trial court failed to give effect to the mitigating evidence presented during the mitigation hearing. Respondent does not assert that this claim is procedurally defaulted. A habeas court may not re-weigh the mitigating evidence presented during trial. As the Sixth Circuit has noted, "[i]n reweighing, a state court effectively vacates the original sentence and resentences the defendant; this process is hardly appropriate in the course of collateral review by a federal court." *Coe v. Bell,* 161 F.3d 320, 334 (6th Cir.1998). Because Dickerson's is, in effect, asking this Court to review and determine the effect of mitigating evidence, addressing

this claim would involve re-weighing the mitigating evidence. As the *Coe* Court dictates, sentencing re-weighing is inappropriate on federal habeas review. Thus, this claim is not well-taken.

### v. Improper Re-weighing on Appeal

■ Finally, Dickerson alleges that the Sixth District Court of Appeals failed to address the issue of the trial court's failure to recite its weighing process as is required under Ohio Revised Code § 2929.03. Instead, the Sixth District held that any errors the trial court made could be cured by its own independent re-weighing. Dickerson alleges that the independent re-weighing the appellate courts perform is a question of fact, distinguishable from the legal question of whether the trial court followed the statutory sentencing proceedings.

The Court cannot address this issue because it involves an issue purely of state law. Dickerson fails to cite any federal authority that holds it appropriate for a federal habeas court to review an appellate decision for failure to comply with or address a trial court's compliance with state statutory law. Because issues of state law are not cognizable in federal habeas proceedings, *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), this claim is not well-taken.

### 3. Eighth Ground for Relief— Grand Jury Violation

■ Dickerson alleges in his eighth claim for relief that the indictment did not state the elements of aggravated burglary. This omission is significant, Dickerson argues, because the aggravated burglary was the basis for one of the capital specifications. Respondent contends this claim is

procedurally defaulted because, although Dickerson raised this issue to the Sixth District Court of Appeals, he failed to raise it to the Ohio Supreme Court. Dickerson acknowledges this failure in his Traverse then fails to provide further argument on the merits. *Traverse*, at 59–60. Thus, the Court will not address the merits of this claim.[14]

### 4. Eleventh Ground for Relief— Insufficient Evidence

In his eleventh ground for relief Dickerson alleges that there was insufficient evidence introduced during trial for a rational factfinder to conclude that he possessed the requisite intent to kill Kevin McCoy. Dickerson acknowledges that the following evidence was adduced during trial to demonstrate that he murdered McCoy: (1) he was at the location where the offense occurred with a gun; (2) he raised the window at the location and may have placed his hand inside the window; (3) Kevin McCoy charged the window with a chair; (4) he fired his gun at the window at the same moment the chair hit it; and, (5) McCoy was shot and killed. *Petition*, at 17. This evidence, Dickerson contends, is insufficient to show that he intended to kill McCoy.

■ In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court explained the standard of review a habeas court must employ when reviewing an insufficiency of the evidence claim. It concluded that the habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

---

**14.** This claim would be without merit in any event. As Respondent notes, the Sixth Circuit has held that due process "requires that the offense be charged with precision and certainty so as to apprize the accused of the

crime of which he stands charged." *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir.1976). Dickerson cannot allege that he was not informed of the charge against him, thus no constitutional violation occurred.

found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781. In applying *Jackson,* this Court must limit itself to evidence adduced during trial because a "sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' *Jackson* does not extend to non-record evidence, including newly discovered evidence." *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)(citing *Jackson* ). The *Jackson* standard does apply, however, "whether the evidence of guilt was direct or circumstantial." *Scott v. Elo,* 302 F.3d 598, 602 (6th Cir.2002)(citing *Spalla v. Foltz,* 788 F.2d 400, 402 (6th Cir.1986)).

■ When reviewing this claim on direct appeal, the Ohio Supreme Court found it to be without merit. It stated:

> In his twelfth proposition of law, appellant contends that his conviction of the aggravated murder of Kevin McCoy is not supported by sufficient evidence, because there was no evidence, as required by R.C. 2903.01(D), to prove that he specifically intended to cause McCoy's death.
>
> A review of the record reveals that McCoy was shot twice by appellant. The first shot was fired into McCoy's chest as he charged the bathroom window through which appellant was making a surreptitious entry. The second shot was fired into the back of McCoy's head as he lay wounded by the first shot in the hallway near the bathroom.
>
> Appellant argues that there is insufficient evidence that he intended to kill McCoy with the first shot, insufficient evidence that McCoy was alive at the time of the second shot, and some evidence that the first shot was fatal. Consequently, appellant argues that while the evidence may support a conviction for involuntary manslaughter, it is insufficient to support a conviction of aggravated murder.

In determining whether there is sufficient evidence to support a conviction, the relevant inquiry is " * * * whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. *Accord State v. Thomas* (1980), 61 Ohio St.2d 223, 400 N.E.2d 401; *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184.

In the cause *sub judice,* the only element in question is whether appellant had the specific intent to cause the death of Kevin McCoy. Contrary to appellant's assertion, we believe that there is sufficient evidence of his specific intent to cause McCoy's death, regardless of which shot is considered to have been the fatal one. If the second was the fatal shot, its point-blank range clearly indicates that appellant specifically intended to kill McCoy. If, on the other hand, the first shot is considered as the fatal one, appellant's specific intent to kill McCoy with the first shot can be inferred from the nature of the second shot, as well as other evidence. In its opinion, the court of appeals held that the first shot was the fatal shot.

In our view, the three-judge panel, as the trier of fact, could have reasonably found that appellant specifically intended to kill McCoy by inference from the direct evidence that appellant shot McCoy in the back of his head point-blank within minutes of his initial shot, or from the evidence that the first shot was fired into the middle of McCoy's chest at close range. Accordingly, we find appellant's twelfth proposition of law to be without merit.

*State v. Dickerson,* 45 Ohio St.3d 206, 543 N.E.2d 1250, 1258–59 (1989)(parallel citations omitted).

The Ohio Supreme Court specifically identified *Jackson* as the controlling Supreme Court authority on insufficiency of evidence issues. Thereafter, the court conducted an extensive review of the evidence determining that, based on the manner in which Dickerson shot McCoy, the panel could infer a specific intent to kill him. This application of *Jackson* is not an unreasonable one. Therefore, Dickerson's eleventh claim is not well-taken.[15]

### 5. Thirteenth Ground for Relief— Post-conviction Review

■■■ Dickerson's thirteenth claim is that Ohio's post-conviction relief process is inadequate. He asserts that, as interpreted by *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), post-conviction review is meaningless because it creates procedural bars for the sake of judicial convenience.

■■■ This Court is not the proper forum in which to grant Dickerson relief. Because post-conviction proceedings are civil rather than criminal proceedings, there can be no constitutional violation at that juncture of appellate process. *Murray v. Giarratano*, 492 U.S. 1, 13, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989). Moreover, Dickerson fails to articulate any infringement for which a federal habeas corpus court can grant relief. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir.1986)("[C]ourts have concluded ... that the writ is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings ... because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration."). Although "the result of the habeas petition

need not necessarily be reversal of the conviction ... the petition must directly dispute the fact or duration of the [petitioner's] confinement." *Id.* at 248 (citation omitted). *See also Alley v. Bell*, 307 F.3d 380, 387 (6th Cir.2002)(citing *Kirby* with approval). Thus, even if the Court were to consider the merits of this claim, it would not serve to refute or reduce Dickerson's conviction or sentence. Consequently, this claim is not well-taken.

### 6. Fourteenth Ground for Relief— Cumulative Error

■■■ Accumulated errors are not tantamount to reversible error "if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict obtained." *Satterwhite v. Texas*, 486 U.S. 249, 259–60, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988)(internal quotation marks and citation omitted). If error occurred, but without constitutional significance, then the error is deemed harmless and the verdict sound. *Id.* Dickerson's cumulative error claim lacks merit because, for the reasons set forth elsewhere in this Opinion, his individual claims lack merit. Dickerson's fourteenth claim is not well-taken.

### VIII. CONCLUSION

Recently, the Sixth Circuit found that a district court need not wait until a petitioner moves for a Certificate of Appealability (hereinafter "COA") before issuing a COA for claims raised in the petition. *Castro v. United States*, 310 F.3d 900 (6th Cir.2002). There, the court reasoned that, because a district judge who has recently denied a writ of habeas corpus will have "an inti-

---

**15.** Dickerson raises for the first time in his Traverse that there was insufficient evidence of prior calculation and design to kill McCoy. Dickerson did not raised this claim at any point in his state-court appeals, however. Thus, this claim is procedurally defaulted.

This claim is without merit in any event. As Respondent notes, the indictment charging Dickerson with aggravated murder did not include the element of prior calculation and design. Thus, the issue of whether the state proved this element is irrelevant.

mate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when she denies the initial petition," it follows that a proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. *Id.* at 901 (internal quotation marks and citations omitted).

Furthermore, in two other Sixth Circuit decisions, the court held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell,* 258 F.3d 484, 487 (6th Cir.2001); *see also Murphy v. Ohio,* 263 F.3d 466 (6th Cir.2001)(remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, it is now appropriate to determine whether to grant a COA as to any of the claims the petitioner presented in his petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

\* \* \* \* \* \*

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court

\* \* \* \* \* \*

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre-and post-AEDPA statutes is that the petitioner now must demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre-and post-AEDPA versions of the statute in *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Id.* at 483, 120 S.Ct. 1595. Thus, the Court determined that

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot,* includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were " 'adequate to deserve encouragement to proceed further.' "

*Id.* at 483–84, 120 S.Ct. 1595 (quoting *Barefoot,* 463 U.S. at 893 n. 4, 103 S.Ct. 3383).

▮▮▮ The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484, 120 S.Ct. 1595. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has

determined procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

After taking the above standard into consideration, the Court finds that five issues merit further review. The Court discusses each claim and its defaulted status below.

Initially, the Court notes that because Dickerson withdrew his first claim in the Petition, it was not considered in this Opinion and, therefore, is not eligible for appellate review. No COA will issue for claim one. The Court also finds that the remaining death penalty unconstitutionality claims are not debatable among reasonable jurists. These claims occur almost *pro forma* in a capital habeas petition but are routinely denied. Accordingly, the Court will not grant a COA as to claims twelve (proportionality and death penalty imposed in racially discriminatory manner) and sixteen (Ohio death penalty unconstitutional on its face or as applied to Dickerson).

■ Conversely, jurists of reason could debate the Court's decision to deny the jury waiver claims. The Court issues a COA as to Dickerson's second and tenth claims for relief (right to withdraw jury waiver). The Court found that these claims were not procedurally defaulted, thus, the Court need only discuss whether the merits of these claims are debatable among jurists of reason. While the Court determined that the right to withdraw a jury waiver is not absolute and that neither the trial court nor defense counsel are obligated to inform a defendant about every consequence of the decision to forego a jury trial, a reasonable jurist could con-

clude that, based on the record, it is unclear whether Dickerson fully comprehended the consequences of his decision. Moreover, it is unclear the extent to which Judge Knepper's *ex parte* conversation with defense counsel Konop influenced Dickerson's decision. Thus, a COA will issue for claims two and ten.

The Court similarly finds that reasonable jurists could debate the Court's decision to deny Dickerson's third claim for relief (right to withdraw waiver after knowledge that Judge Glasser would serve on the panel). Although the limited authority reviewing this issue suggests that Dickerson did not have the right to be informed that he could withdraw his waiver upon learning that Judge Glasser would serve as a panel member, a reasonable jurist could find that, under those unusual factual circumstances, a trial court is constitutionally obligated to inform a criminal defendant that he may withdraw a jury waiver upon learning that a panel member possesses particularized knowledge about him. Thus, the Court will issue a COA for claim three, the issues relating to the right to withdraw the jury waiver only.

■ The Court further finds that its decision to deny certain sub-claims of Dickerson's fourth and ninth claims for relief (ineffective assistance of counsel during guilt and mitigation phases of trial), are debatable. First, some of the sub-claims are procedurally defaulted and thus foreclosed from this Court's and appellate review. While the Court found that some of the sub-claims were not, in fact, defaulted because Dickerson included evidence outside the record to support these claims on post-conviction, a jurist of reason could debate this conclusion. Thus, the Court will issue a COA as to the defaulted status of those claims.

■ Additionally, the Court grants a COA as to the merits of the sub-claims

relating to counsel's ineffectiveness for relying on the *ex parte* conversation with Judge Knepper and counsel's failure to obtain and introduce several facts regarding Dickerson's mental history and family background. While *Sowell* seemingly forecloses any merit debate of the jury waiver claim, a reasonable jurist could find that because Konop believed that Judge Knepper's conversation with him was "a pretty damn good sign" that he would not vote for the death penalty, he may have mislead Dickerson into believing that his decision to forego a jury trial would ensure a life sentence. Thus, a COA will issue for this aspect only of claim four.

The Court will also issue a COA for counsel's failure to investigate and introduce evidence of Dickerson's background during mitigation. Although the Court held that Dr. Sherman and Dr. Gottlieb's testimony provided sufficient insight into Dickerson's mental issues, counsel could have undertaken a more thorough investigation into his childhood and family background. Accordingly a COA will issue for this aspect only of claim nine.

The Court will not issue a COA for claims five, six, seven, or fifteen (trial court sentencing opinion claims). These claims relate primarily to state law issues outside the scope of federal habeas review. Moreover, as stated in the Opinion, any defect in the trial court's sentencing opinion was cured on appellate review. No reasonable jurist would debate this conclusion.

No reasonable jurist would debate the Court's decision to deny ground eight (grand jury violation). This claim is unequivocally procedurally defaulted. Moreover, Dickerson was fully informed of the charges against him. No reasonable jurist would disagree. Thus, no COA will issue for this claim.

Similarly, no jurist of reason could debate the Court's denial of claim 11 (insuffi-ciency of evidence). As noted in the Opinion, the Ohio Supreme Court identified the correct Supreme Court precedent when issuing its opinion. Moreover, there was more than ample evidence for the panel to find Dickerson's guilt. Thus, no COA will issue for this claim.

Finally, the Court will not issue a COA for claims 13 and 14 (post-conviction review and cumulative error). No jurist of reason would debate that a federal habeas proceeding is not the proper forum in which to raise issues regarding the sufficiency of state post-conviction proceedings. Moreover, as stated in the Opinion, the Court has found that no constitutional error occurred during Dickerson's trial. Thus, no cumulative error could have resulted.

For the reasons stated in this Opinion, this Court finds that none of the claims asserted in Dickerson's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 are well-taken. Accordingly, Dickerson's request for habeas corpus relief is denied. The Petition is hereby dismissed.

The Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) as to those claims as noted in the above certificate of appealability analysis.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the Petition pursuant to 28 U.S.C. § 2254 is denied and this action is dismissed.

FURTHER ORDERED that the Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed.

R.App.P.22(b) as set forth in the Memorandum Opinion.